Ozzie T. JENKINS, Appellant,

v.

UNITED STATES, Appellee.

No. 98–CF–1789.

District of Columbia Court of Appeals.

Argued Jan. 23, 2003.
Decided July 7, 2005.

 

Howard, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Barbara J. Valliere, and M. Jeffrey Beatrice, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, and TERRY and FARRELL, Associate Judges.

WAGNER, Chief Judge:

Appellant, Ozzie Jenkins, was found guilty by a jury of aggravated assault while armed (AAWA) (D.C.Code §§ 22–504.1, –3202 (1981)),[1] assault with a dangerous weapon (ADW) (D.C.Code § 22–502 (1981)),[2] and threatening to injure a person (D.C.Code § 22–2307 (1981)).[3] He argues for reversal on the grounds that: (1) the evidence was insufficient to support a finding of "serious bodily injury" required for a conviction of AAWA; (2) the trial court erred in failing to instruct the jury on serious bodily injury and impermissibly broadened the definition of the concept in response to a jury question about what the phrase meant; and (3) AAWA and ADW merge, thereby requiring his conviction for ADW to be vacated. With respect to the crime of aggravated assault while armed, we hold that the trial court, without the benefit of our subsequent decision in *Nixon v. United States,* 730 A.2d 145 (D.C.), *cert. denied,* 528 U.S. 899, 120 S.Ct. 233, 145 L.Ed.2d 196 (1999), defined the statutory element of "serious bodily injury" in a way that impermissibly expanded its meaning. Since we cannot say with fair assurance that this error did not influence the jury's verdict, we reverse and remand for a new trial on that charge. We reject appellant's argument that the evidence was insufficient to support a conviction of aggravated assault while armed

Corinne Beckwith, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant.

Michael T. Truscott, Assistant United States Attorney, with whom Roscoe C.

---

1. Recodified at D.C.Code §§ 22–404.01, –4502 (2001).

2. Recodified at D.C.Code § 22–402 (2001).

3. Recodified at D.C.Code § 22–1810 (2001).

even if the jury had been instructed properly. Finally, although the government concedes that aggravated assault while armed merges with ADW, in light of our disposition, the merger issue is moot for purposes of this appeal.

## I. Factual Background

According to evidence presented by the government, on August 6, 1996, appellant stabbed Noble Whitehead while in front of a store called District Liquors on 11th Street, N.W. Mr. Whitehead accompanied a friend, "Jefferson," downtown to Freedom Plaza at about noon where they listened to music. Since Jefferson was confined to a wheelchair, Mr. Whitehead pushed Jefferson around during the outing. While at Freedom Plaza, Jefferson gave Mr. Whitehead money to purchase vodka for him and beer for himself. After listening to music for about an hour, the two men went to a park where Jefferson ate pizza and drank vodka. Before the men parted company, Jefferson gave the remainder of the pizza and vodka to Mr. Whitehead.

Mr. Whitehead then went to the liquor store on 11th Street to get more beer to have with the pizza. He asked someone named Les, who was in a wheelchair outside the store, to hold his pizza while he went inside. As he approached Les, Mr. Whitehead had noticed appellant standing near a tree about two feet away. The store's manager asked Mr. Whitehead to leave the store because he had an open bottle of vodka in his pocket. Mr. Whitehead went outside and left his vodka with Les while he went back into the store, but he soon returned when the manager refused to sell him more alcohol. Mr. Whitehead told Les that he was going to the store on the corner to get beer.

As Mr. Whitehead started walking toward the other store, he heard someone say "——, I'll kill you," and he thought that Les and appellant were arguing. When Mr. Whitehead turned around, appellant shoved him to the ground and stabbed him. Mr. Whitehead started screaming and grabbed appellant's hand. Appellant told Mr. Whitehead to let him go and he would let him get up. However, as Mr. Whitehead attempted to get up, appellant stabbed him in the arm. When someone yelled that the police had been called, appellant stopped the attack and ran across the street. Mr. Whitehead sustained stab wounds in the stomach, chest and arm as well as three other nicks during the attack. He testified that the bleeding was profuse and that blood was gushing from his arm. Although people told him to remain on the ground until the ambulance arrived, Mr. Whitehead said that fearing that he would die, he walked to the corner and propped himself on a mailbox. Mr. Whitehead was taken by ambulance to Howard University Hospital where he remained for treatment as an in-patient for five days. He displayed to the jury the wounds appellant inflicted to his abdomen, chest and arm and the other minor nicks.

On cross-examination, Mr. Whitehead admitted drinking some malt liquor at 8:30 a.m. and a 40 ounce bottle of beer around noon. He denied being drunk, angry or irritable or that he had smoked crack cocaine on August 6th. However, he admitted that he had used a "dime" of crack cocaine "probably the night before." In addition, he denied becoming angry or cursing or threatening Les for drinking all the liquor. Mr. Whitehead explained that he could not provide the exact time that he was stabbed because he had gone into "shock," but he estimated that it was between 1:00 and 3:00 p.m. When asked if he remembered what happened, Mr. Whitehead said, "[w]hen somebody almost takes your life you don't forget it."

Nathaniel Shaw, a thirteen-year-old boy, was near the corner of 11th and M Streets

on August 6, 1996, around 2:00 p.m. Shaw testified that he was going to the basketball court on his bicycle and heard an argument across the street near the liquor store, where he saw two men and one person in a wheelchair, who was trying to break up the argument. Shaw testified that he saw Mr. Whitehead throw a punch at appellant, and he saw appellant fall. Shaw testified that when Mr. Whitehead approached appellant again, appellant pulled out a knife that appeared to be about seven or eight inches long and stabbed Mr. Whitehead about six or seven times in the side ("ribs") and on the arm. He said that Mr. Whitehead was trying to move away as appellant stabbed him, and appellant stabbed him again. According to Shaw, the person in the wheelchair backed away when appellant pulled out the knife, which clicked open automatically. Shaw watched appellant run up the street after the incident. Shaw said that Mr. Whitehead tried to get up, but he fell back down. Shaw testified that Mr. Whitehead had blood all over his shirt. When the police arrived, Shaw, who had seen appellant run up the street after the incident, informed the police that a bald, black man, wearing black clothes and white tennis shoes, was the assailant. Shaw got in the police car, and he identified appellant as the assailant after they located him.

Officer Timothy Palchak, a Metropolitan Police Department officer, was on patrol on August 6, 1996, and he went to 11th Street in response to a radio call at approximately 2:15 p.m. He testified that when he arrived, he saw Mr. Whitehead leaning on a mailbox suffering from an injury, which he believed to be stab wounds because of the nature of the radio call, the way Mr. Whitehead was positioned, and the amount of blood on Mr. Whitehead's shirt and on the ground. According to the officer, Mr. Whitehead appeared "disoriented" and in "a great deal of pain." Mr. Whitehead was about ten to fifteen feet away from where the altercation occurred when Officer Palchak observed him leaning on the mailbox. Officer Palchak corroborated that Shaw had described the assailant as a black male, bald and wearing all black clothing. Officer Palchak placed a lookout for the suspect over the police radio, and subsequently drove Shaw to the 1300 block of 10th Street, N.W. where the police had stopped appellant, and Shaw identified appellant as the assailant.

Officer Terrence L. Shirk, a reserve crime scene search officer, took photographs of appellant at the Third District cellblock, which were admitted into evidence. Officer Shirk testified that appellant appeared sweaty and that he had a red substance that appeared to be blood near the left side of his knee, the cuff of his pants and on his white tennis shoes.

Sterling Williams was a friend of appellant, and they "h[u]ng out" at the liquor store where Mr. Williams was employed. Mr. Williams testified that he had known appellant since 1995, and he knew Mr. Whitehead from around the neighborhood since 1996. Mr. Williams testified that he was present at the time of the incident involving appellant and Mr. Whitehead. He testified that they were drinking, but he and appellant were not drunk. He said that Mr. Whitehead was with Terrence Spiller at that time and was complaining that Les drank all the vodka, and he pushed Les' wheelchair. He said that Mr. Whitehead called Les names and tried to lift Les out of the chair to see if he had another bottle hidden. When appellant told Mr. Whitehead to leave Les alone, Mr. Whitehead attacked appellant, according to Mr. Williams. He testified that Mr. Whitehead told appellant "to get the hell out of his face" and that he was going to "f[ ] him up" if he got a chance. Appellant went around the chair and started tussling

with Mr. Whitehead, and they ended up on the ground. Mr. Williams testified that he grabbed appellant and walked away and that he did not see a knife. Mr. Williams testified on cross-examination that it was appellant who went after Mr. Whitehead, and that the fight went on for about five minutes before he intervened when appellant was on top of Mr. Whitehead. Mr. Williams testified that he saw blood coming through Mr. Whitehead's shirt after the attack.

## II. Claim of Instructional Error

Appellant argues that his conviction for aggravated assault while armed should be vacated because the trial court erred in: (1) failing to provide the jury, prior to deliberations, with a definition of "serious bodily injury" within the meaning of the aggravated assault statute; and (2) subsequently giving an unconstitutionally broad definition for the term in response to a jury question. He contends that the court was required to provide an instruction before jury deliberations began and that the instruction the court gave in response to the jury's note expanded the class of injuries encompassed by the aggravated assault statute. The government responds that any error in the court's initial failure to provide an instruction was invited by appellant and, in any event, rendered harmless by the court's subsequent instruction. Further, the government contends that the instruction that the court gave adequately informed the jury about the severity of the injury required to constitute "serious bodily injury" and that it was substantially similar to the definition later adopted by this court in *Nixon, supra*, 730 A.2d at 150.

### A. *Factual and Procedural Background*

After the conclusion of the presentation of the evidence, the court discussed with counsel proposed jury instructions. The prosecutor requested that the court include with the instruction on aggravated assault, a definition for "serious bodily injury" as follows: "bodily injury that involves a substantial risk of death, unconsciousness, extreme physical pain[,] protracted and obvious disfigurement or protracted loss or impairment of a function of a bodily member, organ, or mental faculty."[4] Defense counsel stated that she had no objection, and the court agreed to give the instruction. However, the court then inquired whether defense counsel had read a comment to the instruction that stated that "because the issue of whether a bodily injury is serious appears to be a jury question[,] the committee has not included a definition in the instruction." The following colloquy ensued:

> [DEFENSE COUNSEL]: ... Your Honor, what I'm thinking is [the jury is] probably going to ask for a definition, but ... until they do I object, Your Honor, I object.
>
> [THE COURT]: All right.
>
> [DEFENSE COUNSEL]: I take back what I said, I withdraw.
>
> [THE COURT]: And moreover the proposed language includes obvious disfigurement, protracted loss or impairment of the function of a bodily member, organ, or mental faculty. The definition would have been too broad anyway.... So for now I'm not going to give a definition of serious bodily injury for aggravated assault any more than we do for any other instruction, and if there's a

---

4. The prosecutor explained that the definition appeared in the footnote, apparently to the STANDARDIZED CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.06A (4th ed. 1996).

He further stated that it was the definition given by the Council of the District of Columbia.

concern the jury will raise it and then and only then will we give them some portion of that definition.

Consistent with this determination, the trial court did not include a definition for "serious bodily injury" within the meaning of aggravated assault.[5] After it had completed its instructions to the jury, the trial court inquired of counsel for both sides if anything was left out, and each responded no.

While deliberating, the jury sent a note to the court inquiring whether there was a definition for "serious bodily injury." Before providing a response, the court discussed with counsel several possibilities, and proposed combining all three definitions set forth in the comment to the instructions.[6] Defense counsel objected that one of the definitions was from a sexual abuse context, and the other related to a battery. Defense counsel suggested that the court permit the parties to brief the issue over the weekend. Noting that it was 5:00 o'clock, the court stated that it would draft some combination of the three definitions and instruct the jury the following Monday.

The court provided counsel with a proposed instruction by facsimile transmission on Friday, and it considered their related submissions before proposing the following instruction as a definition for "serious bodily injury":

> Serious bodily injury means bodily injury which: 1. [c]reates a substantial risk of death; 2. [c]auses serious permanent disfigurement; 3. [c]auses protracted loss or impairment of the functions of any bodily member or organ; and 4. [c]auses a serious impairment of physical condition.

The trial court explained that the proposed instruction combined parts of the three definitions given in the Red Book comment. The court stated that the instruction "does illuminate the listing of consciousness, extreme physical pain, et cetera, but defines that listing as a serious impairment of physical condition." The prosecutor said that he did not oppose the instruction. Defense counsel objected to part 4, which states "causes a serious impairment of physical condition," because this language, taken from the California Penal Code, represented a "much lesser crime than our crime of aggravated assault." The trial court overruled the objection and gave the definition as described above in answer to the jury's note.

---

**5.** For aggravated assault while armed, the trial court instructed the jury that the government was required to prove beyond a reasonable doubt the following:

... [F]irst[,] ... that the defendant caused seriously bodily injury to Noble Whitehead.

Two, that the defendant either a) intended to cause serious bodily injury to another person or knew that serious bodily injury to another would result from his conduct, or b) he intentionally or knowingly engaged in conduct which created a grave or serious risk of serious bodily injury to Noble Whitehead and which manifested an extreme indifference to human life.

Number three, that at the time of the offense the defendant was armed with or had readily available a knife.

**6.** The first definition was "bodily injury which creates a substantial risk of death, causes serious permanent disfigurement, or causes protracted loss or impairment of functions of bodily members and organs." The court observed that the second definition was close to the first, "but it includes extreme physical pain, unconsciousness and then protracted and obvious disfigurement, etc." The third definition mentioned by the court (taken from the California Penal Code as cited in *Comber v. United States*, 584 A.2d 26, 38 n. 10 (D.C. 1990) (en banc)) included "loss of consciousness, concussion, bone fracture, and then ... even a wound requiring extensive suturing."

### B. *Analysis*

 Appellant argues that the trial court erred in failing to define for the jury prior to deliberations "serious bodily injury." The government contends that any error in this regard was invited or harmless, and therefore not a basis for reversal of the conviction. The omission of a definition for serious bodily injury in an aggravated assault case is error, as the government recognizes. *See Zeledon v. United States,* 770 A.2d 972, 973 (D.C.2001) (citing *Nixon, supra,* 730 A.2d at 145) (In a prosecution for aggravated assault while armed, instruction on the definition of serious bodily injury is required.). Whether appellant's final position before the initial instructions to the jury was that no instruction should be given is less than clear. On the one hand, as appellant argues, her statement of withdrawal, perhaps of consent, could have related to defense counsel's immediately preceding agreement to await jury inquiry before giving an instruction. On the other hand, a reading of the record in context tends to support the government's argument that defense counsel, in stating, "I, withdraw," was referring to her earlier assent to the giving of the proposed instruction and amounted to an acquiescence in the court's decision to defer any instruction pending jury inquiry. However, in light of our conclusion that the instruction that the trial court ultimately provided and to which appellant did object was erroneous, we need not resolve the government's waiver argument.

To prove the crime of aggravated assault while armed, the government is required to show that the accused: "(1) caused serious bodily injury to [the victim]; and (2) either 'knowingly or purposely cause[d] serious bodily injury to

[him]'; or '[u]nder circumstances manifesting extreme indifference to human life, ... intentionally or knowingly engage[d] in conduct which create[d] a grave risk of serious bodily injury to [him], and thereby cause[d] serious bodily injury.'" *Nixon, supra,* 730 A.2d at 149 (citing D.C.Code §§ 22–504.1,—3202). The statute does not define the term "serious bodily injury." However, in *Nixon,* following the majority of jurisdictions, this court adopted the following definition:

> bodily injury that involves a substantial risk of death, unconsciousness, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ or mental faculty.[7]

*Id.* at 150. This court has held that the trial court errs in instructing the jury on aggravated assault when it does not include a definition of "serious bodily injury" consistent with the formulation in *Nixon* or something very close to it. *Gathy v. United States,* 754 A.2d 912, 916 & n. 4 (D.C.2000).

In the present case, tried before *Nixon,* the trial court's definition of the term included some, but not all, of the components enumerated in *Nixon,* and added a phrase not included in the *Nixon* definition. The added phrase is that "serious bodily injury" includes a bodily injury that has "[c]ause[d] a serious impairment of physical condition." Appellant argues that this expanded definition permitted a conviction based upon conduct that does not constitute aggravated assault. The government contends that the trial court's definition comported generally with the one adopted by this court in *Nixon.* Therefore, the issue before us is whether the trial court's instruction impermissibly broadened the meaning of the term, as appellant argues,

---

**7.** We noted in *Nixon* that the definition is the same as the one found in the District's sexual abuse statute, D.C.Code § 22–4101(7) (1996). *Nixon, supra,* 730 A.2d at 150.

or whether it was within the narrow tolerance of "something very close to it" left open in *Gathy* for deviations from the *Nixon* definition.

We conclude that the concept, "serious impairment of physical condition," broadens impermissibly the core meaning of "serious bodily injury" established by *Nixon*. The problem is not that the phrase fails to tell the jury that the injury must be "serious." Rather, it is that it untethers "impairment" from the specificity or concreteness that it possesses when linked, as *Nixon* linked it, to "the *functions* of a bodily member, organ or mental faculty." *See Nixon, supra,* 730 A.2d at 150 (emphasis added). Similarly, the phrase connotes a level of generality not conveyed by the companion terms of "substantial risk of death, unconsciousness, extreme physical pain, protracted and obvious disfigurement," also adopted in *Nixon. Id.* at 149. In *Riddick v. United States*, 806 A.2d 631, 638 (D.C.2002) (quoting *Zeledon, supra,* 770 A.2d at 977), this court reiterated the need for a "precise definition" of "serious bodily injury" "in order to avoid the danger that 'jurors may set the standard of 'aggravation' below what the legislature intended in fashioning a crime that increases twenty-fold the maximum prison term for simple assault.'"

Although the phrase, "serious bodily injury," does not lend itself readily to a simple definition or formula, we hold that equating it with "serious impairment of a physical condition" sacrifices more precision than the statutory concept can tolerate, as least as interpreted by *Nixon*. Indeed, by not including within the *Nixon* definition such vague or catch all phrases as "other serious bodily harm" or "impairment of health," used by some jurisdictions that the court surveyed in the opinion, this court may be said to have implicitly rejected them. *See Nixon, supra,* 730 A.2d at 149–50.[8] The definition, "serious impairment of a physical condition," suffers from the same lack of clarity as "serious bodily injury" in defining the high threshold of injury required for aggravated assault.[9] For these reasons, we conclude that the trial court erred in instructing the jury that it could convict based on evidence of "serious impairment of physical condition," and we turn to consideration of whether the error requires reversal of appellant's conviction of aggravated assault while armed.

■ The government argues that any error is non-constitutional and therefore, reviewable for prejudice under the harmless error standard set forth in *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) (The *Kotteakos* test is whether we can say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error."). Although arguing for application of the standard for evaluating prejudice for constitutional error under *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (requiring reversal unless the error was harmless beyond a reasonable doubt), appellant contends that he

---

8. In *Nixon*, for example, we reviewed a definition for "serious bodily injury" from a Minnesota statute, the catch-all of "other serious bodily harm" in addition to other more descriptive terms (MINN. STAT. § 609.2, subd. 8 (1982)) and the Connecticut definition, which includes "serious impairment of health," along with more terms (CONN. GEN. STAT. § 53a–3 (4)). *Nixon, supra,* 730 A.2d at 150.

9. In fact, "impair" is a synonym for "injure." *See* AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 62 (3d ed. 1992). Thus, there is no meaningful difference between serious bodily injury and serious impairment of a physical condition for purposes of defining the former for the jury.

is entitled to a new trial under either standard. We agree with the government that the instructional error here did not rise to the level of constitutional error because the trial court instructed the jury on each element of the offense and provided guidance, albeit partially erroneous, on the meaning of "serious bodily injury." *See White v. United States*, 613 A.2d 869, 877, 879 (D.C.1992) (en banc) ("[I]ncomplete or inaccurate jury instructions [fall] within the category of errors in the trial process itself, rather than that of structural defects involving basic protections ....," which are reversible *per se*.); *Brooks v. United States*, 599 A.2d 1094, 1101–02 (D.C.1991) (instructional error is subject to harmless error analysis under *Kotteakos*).

■ Applying the *Kotteakos* standard of review for non-constitutional error, we cannot say with fair assurance that the error did not have a substantial influence on the verdict. *Kotteakos, supra*, 328 U.S. at 765, 66 S.Ct. 1239. In other words, we cannot say with "fair assurance" that the jury did not rest the verdict on the impermissibly broadened definition provided in the instruction for the statutory element. Although we conclude that the evidence was sufficient to permit a properly instructed jury to convict appellant of aggravated assault, as discussed in Part III., the evidence was not overwhelming or particularly strong as to any of the components of "serious bodily injury" as set forth in *Nixon, supra*. Thus, there is a real danger that the jury may have measured seriousness against the less demanding, catch-all standard of "impairment of physical condi-

tion," rather than the heightened level of injury described in *Nixon* (*e.g.*, substantial risk of death, extreme physical pain, or protracted or obvious disfigurement[10]). Therefore, as to the charge of aggravated assault while armed, the case must be retried, if the government chooses to go forward on that charge on remand.[11]

## III. Sufficiency of the Evidence

■ Appellant argues that the evidence was insufficient to support the "serious bodily injury" requirement of aggravated assault while armed. Specifically, he contends that the cuts that Mr. Whitehead sustained were insufficient to constitute "serious bodily injury" as the term has been defined in *Nixon, supra*, 730 A.2d at 150, and therefore the conviction on that count must be vacated. The government contends that the evidence was sufficient for a rational juror to find appellant guilty of inflicting a "serious bodily injury" for inflicting multiple stab wounds on Mr. Whitehead.

■ In reviewing claims of evidentiary insufficiency, this court must view the evidence in the light most favorable to the government, deferring to the province of the jury to weigh the evidence, resolve questions of credibility and draw justifiable inferences. *Anderson v. United States*, 857 A.2d 451, 463 (D.C.2004) (citing *Owens v. United States*, 688 A.2d 399, 402–403 (D.C.1996)). We will reverse only if there is no evidence upon which a reasonable mind may fairly find guilt beyond a reasonable doubt. *Id.* (citing *Zanders v. United States*, 678 A.2d 556, 563 (D.C.

---

10. The trial court mistakenly instructed the jury that disfigurement would have to be "permanent" to qualify. *See Hudson v. United States*, 790 A.2d 531, 533–34 (D.C.2002) (explaining that aggravated assault can be satisfied by proof of "protracted and obvious disfigurement, ... a condition of lesser duration than [ ] permanent disfigurement").

11. We note that the trial court sentenced appellant to two to six years of incarceration on the aggravated assault while armed count to run concurrently with a sentence of one to three years on the assault with a dangerous weapon count, but consecutive to a one to three year sentence on the threatening to injure count.

1996)); *Lewis v. United States,* 767 A.2d 219, 222 (D.C.2001) (citations omitted). The government must only present "at least some probative evidence on each of the essential elements of the crime." *Jennings v. United States,* 431 A.2d 552, 555 (D.C.1981), *cert. denied,* 457 U.S. 1135, 102 S.Ct. 2964, 73 L.Ed.2d 1353 (1982) (citing *Moore v. United States,* 388 A.2d 889 (D.C. 1978)).

Viewed in the light most favorable to the government, the evidence was sufficient to support a conclusion by the jury that Mr. Whitehead experienced both extreme pain and obvious and protracted disfigurement as a result of the assault.[12] The evidence showed that Mr. Whitehead sustained stab wounds to the stomach, chest and arm in addition to minor nicks from appellant's knife attack. Mr. Whitehead testified that appellant "pushed the knife straight in [his] stomach with both hands" and that "almost the whole blade went in [him]." Nathaniel Shaw, the thirteen-year-old boy who witnessed the attack, described appellant's knife as being a long knife, about seven or eight inches long. Mr. Whitehead testified that he screamed when stabbed and that he was bleeding profusely. Fearing that he would die, Mr. Whitehead said that he went over to a mailbox and propped himself up. Shaw said that Mr. Whitehead tried to get up at one point, but fell back to the ground. Shaw corroborated that Mr. Whitehead had blood all over his shirt.

Officer Palchak testified that when he arrived at the scene in response to a radio call, he observed Mr. Whitehead leaning on a mailbox suffering from stab wounds. He testified that there was a lot of blood on Mr. Whitehead's shirt and some on the ground. Officer Palchak testified that Mr. Whitehead "appeared to be disoriented and in a *great deal of pain.*" (Emphasis added.)

Mr. Whitehead had to be taken by ambulance to Howard University Hospital where he underwent emergency exploratory surgery followed by five days of inpatient treatment. The hospital's principal diagnosis was "[m]ultiple [s]tab wounds to the chest, abdomen and left arm with resultant exploratory laparotomy." According to the medical records, Mr. Whitehead complained of pain at the site of his stab wounds to the chest, right side of the abdomen and left arm when admitted. It was not until the fifth day of hospitalization that Mr. Whitehead could move his left arm without difficulty and was considered stable enough for discharge. Upon discharge, Mr. Whitehead was prescribed medication for pain and instructed not to engage in strenuous activity or heavy lifting. Mr. Whitehead displayed his wounds to the jury at trial.

This evidence was sufficient to permit a reasonable juror to find that the injuries that appellant inflicted upon Mr. Whitehead caused extreme physical pain and protracted and obvious disfigurement. *See Nixon, supra,* 730 A.2d at 150 (citing D.C.Code § 22–4101(7) (1996)). From the evidence of the nature of the injuries, Mr. Whitehead's reaction during the attack, the officer's observation that he appeared to be in pain, the medical records documenting his complaints of pain, and his medication for pain, the jury could reasonably conclude that Mr. Whitehead suffered extreme physical pain as a result of the assault. In determining the painful na-

---

12. Although the trial court did not include references to "unconsciousness" and "extreme physical pain," in its definition of "serious bodily injury," appellant challenges measuring evidentiary sufficiency applying these definitions for purposes of the aggravated assault statute. While he recognizes that these definitional terms were approved in *Nixon, supra,* 730 A.2d at 150, he seeks to preserve the issue for any future *en banc* review.

ture of the injuries, the jury could also consider that as a consequence of his stab wounds, the victim had to have surgery, which is also likely to cause pain. *See McKinnon v. United States*, 550 A.2d 915, 918 (D.C.1988) ("[A] criminal defendant proximately causes, and thus can be held criminally accountable for, all harms that are reasonably foreseeable consequences of his or her actions."). Therefore, that some of Mr. Whitehead's pain may have been associated with the surgery required as a result of the stab wounds is of no consequence on this issue. Contrary to appellant's argument, that Mr. Whitehead did not testify that he endured "extreme physical pain" does not preclude a finding that his injuries caused extreme physical pain in light of other substantial evidence supporting that finding.

Similarly, the jury could find reasonably that Mr. Whitehead sustained protracted and obvious disfigurement as a result of the assault. *See Hudson, supra*, 790 A.2d at 533–34 & n. 2 (permanent leg scar from burn with a clothes iron is sufficient to meet greater requirement for malicious disfigurement, and therefore, leaves no room to doubt that it meets a condition of lesser duration required for aggravated assault, *i.e.*, protracted and obvious disfigurement [13]). It can be reasonably inferred from the evidence that the injuries that Mr. Whitehead sustained produced scarring or disfigurement. Indeed, since the jurors could see for themselves the scars left by the stabbing almost two years after the assault, they could have concluded rea-

sonably that the disfigurement was protracted.

Appellant argues that the sufficiency analysis cannot take into account the component of "extreme physical pain," because the trial court failed to instruct the jury on that element. It is his position that evidentiary sufficiency can be measured only in light of the theories actually presented to the jury. This is contrary to our decision in *Gathy, supra*, 754 A.2d at 912.[14] In *Gathy*, the trial failed to instruct at all on the meaning of "serious bodily injury," and we concluded that the evidence was sufficient for a reasonable jury to find that the victim suffered "serious bodily injuries involving a substantial risk of unconsciousness, extreme physical pain, or protracted and obvious disfigurement." *Id.* at 918–19. Therefore, we concluded that the government could elect to retry Gathy for the aggravated assault with a dangerous weapon or have judgment entered on the lesser included offense of assault with a dangerous weapon. *Id.* at 920. It follows here that the sufficiency of the proof of "extreme physical pain" allows appellant to be tried again for aggravated assault, notwithstanding the jury's inability to consider that theory because of the erroneous instruction.

Appellant cites *Griffin v. United States*, 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991) in support of his argument that the alternative means of demonstrating aggravated assault for which no instruction was given cannot be the basis of a finding of

---

**13.** In the context of permanent disfigurement, "a person is permanently disfigured if she [or he] 'is appreciably less attractive ....'" *Hudson, supra*, 790 A.2d at 533–34 n. 2 (quoting *Perkins v. United States*, 446 A.2d 19, 26 (D.C. 1982)).

**14.** Similarly, in *Neder v. United States*, 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999), the trial court had failed to instruct the jury on materiality, an element of the tax

and fraud charges at issue. The Supreme Court did not conclude that the omission prohibited an assessment of the sufficiency of the evidence of materiality, but rather held that the instructional error was harmless beyond a reasonable doubt where the omitted element was uncontested and supported by overwhelming evidence, and therefore upheld the tax fraud convictions. *Id.* at 17–20, 119 S.Ct. 1827.

sufficient evidence. However, *Griffin* is distinguishable because it held only that a conviction will be upheld on a theory submitted to the jury on legally sufficient evidence, although a "factually inadequate theory" has also been submitted for the jury's consideration.[15] In the present case, the issue concerns only the permissibility of retrial for an offense where the jury has been provided with an incomplete list of the components of an element of the offense and one improper component of that element. Similarly, the Supreme Court's opinion in *Nye & Nissen v. United States,* 336 U.S. 613, 618, 69 S.Ct. 766, 93 L.Ed. 919 (1949), while recognizing that a verdict may not be upheld on a particular theory of liability without "submission of those fact issues to the jury," does not foreclose a retrial before a jury properly instructed on the theory. Finally, in *McGee v. United States,* 533 A.2d 1268 (D.C.1987), this court directed entry of judgment of acquittal on the charged offense of attempted-battery assault; however, we did not suggest that the defendant could not be retried for intent-to-frighten assault, a distinct kind of criminal assault on which the jury had not been instructed. *Id.* at 1269–71. Accordingly, we conclude that the instructional error in this case does not prevent retrial on the aggravated assault count.

For the foregoing reasons, we reverse appellant's conviction of aggravated assault while armed and remand for retrial on that count, if the government elects to proceed on that count. We affirm appellant's convictions for threats and ADW, although we observe that the latter conviction may merge depending on the outcome of further proceedings.

*Affirmed in part, and reversed and remanded in part.*

**15.** In *Griffin, supra,* the Supreme Court adhered to the rule that " '[w]hen a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, ... the verdict stands if the evidence is sufficient with respect to any one of the acts charged.' " 502 U.S. at 56–57, 112 S.Ct. 466 (quoting *Turner v. United States,* 396 U.S. 398, 420, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970)) (other citation omitted). Applying the *Turner* rule for a multiple-object and multiple-overt-act conspiracy, the Supreme Court rejected petitioner's due process argument that her conviction for conspiracy, for which a general verdict was returned, should be overturned because the jury was permitted to find her guilty if it found that she participated in either one of two objects of the conspiracy while the evidence was sufficient to support only one of the two. *Id.* at 48, 112 S.Ct. 466. It is worth noting that the Supreme Court stated that it would be preferable to remove the unsupported theory from the jury's consideration, although it was not persuaded to reverse even though the petitioner had requested such an instruction. *Id.* at 48, 60, 112 S.Ct. 466.