**Bruce GREEN, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 03–CF–1190.

District of Columbia Court of Appeals.

Argued March 2, 2006.

Decided May 22, 2008.

---

Donald L. Dworsky for appellant.

Amy Zubrensky, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney, at the time the brief was filed, John R. Fisher, Assistant United States Attorney, at the time the brief was filed, and Roy W. McLeese III and Kathleen J. Monaghan,

Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and KRAMER, Associate Judges, and SCHWELB, Senior Judge.[*]

KRAMER, Associate Judge:

In a ten-count indictment, appellant was charged with various counts of Incest, First-and Second–Degree Child Sexual Abuse, Sexual Performance Using a Minor and Threats. The complainants were his daughters, E.F. and S.F., and, in one count, A.T., a friend of the daughters. The jury convicted appellant of two counts of Second–Degree Child Sexual Abuse, one relating to E.F. and one to S.F., and one count of Sexual Performance Using a Minor relating to E.F. Appellant was sentenced to seven years of incarceration on each charge of Second–Degree Child Sex Abuse and one year of incarceration on the charge of Sexual Performance with a Minor, all the periods of incarceration to run consecutively.

On appeal, appellant contends that the trial court's failure to instruct the jury on the element of intent required for conviction on the Second–Degree Child Sexual Abuse charges requires that those convictions be reversed. He also asserts that the court's failure to define the word "lewd" requires reversal of his Sexual Performance Using a Minor conviction, and that even if reversal were not required on that ground, the evidence was insufficient to sustain this conviction. While the government concedes error with respect to the court's failure to instruct on intent in connection with the Sexual Abuse charges

and also concedes that it was plain (in the sense of obvious), it asserts that appellant has failed to meet the other elements of the plain error doctrine, that is, that the error affected appellant's substantial rights or the fairness of the trial.[1] The government denies any error in connection with the definition of "lewd" and maintains that there was sufficient evidence to convict appellant of Sexual Performance Using a Minor. We affirm.

## I. Trial Proceedings

The evidence at trial, viewed in the light most favorable to the government, established that S.F. and E.F. first met appellant, their biological father, in 1995, when they were eight and nine years old, respectively. E.F. lived with appellant on Green Street in the Southeast quadrant of the District from the end of 1995 until 1998, when she left to live with her grandmother. Though she did not live with appellant after 1998, E.F. made overnight visits to him on the weekends. E.F. did not enjoy these visits, but consented to them for fear that, if she refused, appellant would "either hit [her] or . . . catch one of his really bad tempers."

Appellant's Green Street apartment was in a building that was abandoned during most of E.F.'s visits there. The apartment itself was "in disarray, filthy and full of trash," and had "holes in the wall[s]." There was no running water and appellant provided water in buckets from a fire hydrant. The apartment also had a "makeshift kitchen," a rocking chair, and two mattresses placed on the floor that served as beds.

---

[*] Judge Schwelb was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on June 24, 2006.

**1.** *See also* Super. Ct.Crim. R. 30 (stating that, with respect to jury instructions, "[n]o

party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider the verdict").

Though appellant had two mattresses, E.F. slept in the same bed with appellant when she visited. She generally slept at the opposite end of the bed from appellant because she did not trust him. This distrust arose from "the way he acted," including "say[ing] that [she] was his daughter" but "looking at [her] as if [she] was ... a girlfriend," and taking nude Polaroid photographs of her.

E.F. testified that appellant took nude photos of her "more than 20 times" when she stayed at his apartment. She further testified that he photographed her genitals on at least five of those occasions. According to E.F., appellant took these pictures because "he felt [his daughters] were [more] beautiful ... without clothing." When he took these pictures, appellant occasionally gave E.F. specific instructions, such as "get up on the bed and ... show your butt," "turn around and smile," and "pose like the girls in porno magazines."[2] E.F. claimed that, on at least one occasion, appellant hit her when she refused to pose, and that other times he bribed her with small sums of money.

During this period, appellant also began touching E.F. in ways that made her uncomfortable. According to E.F., he touched her buttocks and breasts on multiple occasions and touched her vagina at least once. One night in July 2001, appellant joined E.F. in bed while she was watching television and started "messing with [her]." He rubbed her arms and commented on their roughness, he then went "down some more" and commented that E.F. "need[ed] to comb [her] pubic hair." After she fell partially asleep, appellant continued touching E.F., moving to her legs and inner thighs. E.F. awoke to realize that he was touching her vagina. She eventually fought him off and he

stopped touching her. While E.F. did not contemporaneously tell anyone the specifics of this incident, she did tell her friend A.T. that her father had tried "to feel on her."

In 2001, the victims' grandmother refused to allow S.F, E.F.'s sister, to continue living in her home because of behavioral issues. At her mother's request, S.F. moved in with appellant. S.F. also shared the large mattress with appellant and when E.F. would visit them, all three slept in the same bed. After S.F. moved into his apartment, appellant began to "touch [her] in ways that made [her] feel uncomfortable." She testified that he touched her breasts, buttocks and vagina on multiple occasions. At times, while he touched her, he would repeatedly say, "See how you do me."

On one particular occasion when S.F. was home sick from school, S.F. awoke to appellant touching her feet. She kicked appellant and told him to stop, but instead he pulled her to the end of the bed, yanked on her clothes, and touched her vagina, buttocks and breasts, saying, "See how you do me?" S.F. testified that this incident ended after appellant inserted his penis halfway into her vagina. Like E.F., S.F. did not tell anyone of the specific instances of abuse, but she told her sister of her discomfort with appellant's touching. She also told her friend A.T. that appellant was "feeling on her," which A.T. understood to mean that appellant had touched S.F.'s "chest and private parts," including her vagina and buttocks.

On July 20, 2002, the girls' mother and S.F. spent the day together. When they returned to appellant's apartment the mother, her boyfriend and appellant had an argument in front of the building. The

---

2. E.F. testified that she had seen a pornographic magazine on one occasion before receiving this instruction and that the way the girls posed was "disgusting."

police were called to investigate a potential assault, and Officer Tracy Jackson saw S.F. hanging out of a window crying and yelling for her mother. Officer Jackson gained access to the building and saw that S.F. was unclean and that she appeared to have urinated on herself. Officer Jackson took custody of S.F., and on the way to the Child and Family Services Agency, S.F., visibly angry with her father, told Officer Jackson that appellant had "sexually molested" her. As a result, Officer Jackson took S.F. to the Children's National Medical Center for a sexual-abuse examination.[3]

In addition to E.F. and S.F.'s testimony, the government presented testimony from Monica Avenc and Carolyn Cross, appellant's neighbors. They testified that in late spring of 2002, they heard S.F. yelling as they walked by appellant's apartment. Ms. Cross testified that she heard S.F. say, "Stop. Get off of me. Leave me alone." Ms. Avenc heard her scream, "Get your hands off of me. I'm tired of you ... touching me. Just leave me alone." Ms. Cross was unconcerned and thought that appellant might just be disciplining S.F. Ms. Avenc, on the other hand, was very concerned because S.F. sounded afraid, but she did not contact the police.

Appellant, who did not testify, called only one witness, Detective Andre Davis, the lead detective in the case. Davis testified that, subsequent to appellant's arrest, he learned that appellant had a camper outside of the apartment building that he used for storage. By the time Detective Davis obtained a search warrant for the camper, however, it had been "stripped-down" and "destroyed."

In closing argument, defense counsel attacked the credibility of the witnesses, particularly appellant's daughters. Focusing on inconsistencies in their stories brought out under cross-examination, counsel argued that the girls manufactured the stories of molestation and nude photography because they did not like appellant and did not wish to continue seeing him.

## II. Failure to Instruct on Intent Element of Child Sexual Abuse Count

In the District of Columbia, an individual commits the offense of Second–Degree Child Sexual Abuse when he or she, "being at least four years older than a child [defined as 'a person who has not yet attained the age of 16 years,' D.C.Code § 22–3001(3) (2001)], engages in sexual contact with that child or causes that child to engage in sexual contact." D.C.Code § 22–3009 (2001). "Sexual contact" is defined as "the touching with any clothed or unclothed body part or any object, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of any person *with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person.*" *Id.* § 22–3001(9) (emphasis added).

At the close of the evidence, the trial court instructed the jury as follows with respect to the charges of Second–Degree Child Sexual Abuse: "The essential elements of second degree child sexual abuse, each of which the government must prove beyond a reasonable doubt are ... that the defendant knowingly touched the breasts, thighs, and buttocks of [the complainants], and that the defendant was at least four years older than the complainant[s]." Although the jury instruction failed to include any instruction with re-

---

**3.** That examination showed that S.F. had syphilis. Appellant also tested positive for sy- philis.

spect to the intent element of the crime, appellant neither brought this to the attention of the court nor objected to the instructions as given.

■ In *United States v. Olano,* 507 U.S. 725, 731, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), the Supreme Court examined the scope of Federal Rule of Criminal Procedure 52(b), identical to Superior Court Rule of Criminal Procedure 52(b), which reads, "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the Court." Quoting *Yakus v. United States,* 321 U.S. 414, 444, 64 S.Ct. 660, 88 L.Ed. 834 (1944), the Court noted that " 'a constitutional right' or a right of any other sort, 'may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.' " *Olano,* 507 U.S. at 731, 113 S.Ct. 1770. As the Court explained, when a right has not been asserted through objection stated to the court or otherwise, we must apply the plain error test to our review of the claim. In order to prevail under the plain error test, an appellant must show (1) error, (2) that is plain or obvious, (3) that affected the appellant's substantial rights, and (4) that seriously affected the fairness, integrity or public reputation of judicial proceedings. *See id.* at 731–38, 113 S.Ct. 1770; *see also Johnson v. United States,* 520 U.S.

461, 466–467, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997).[4]

■ As an initial matter, we note that the failure to instruct on an element of an offense does not *per se* satisfy the plain error test. In *Johnson,* the Supreme Court analogized the error of the trial judge—in taking the issue of materiality from the jury—to the error of failing to instruct on an element of an offense. It concluded that, even assuming that the failure to submit materiality to the jury "affect[s][a] substantial right," it did not "seriously affect[ ] the fairness, integrity or public reputation of [the] judicial proceedings." *Johnson, supra,* 520 U.S. at 469–70, 117 S.Ct. 1544. Two years later, in *Neder, supra,* note 4, 527 U.S. at 1, 119 S.Ct. 1827, the Supreme Court wrote: "[A]n instruction that omits an element of the offense does not necessarily render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." *Id.* at 4, 119 S.Ct. 1827.

Indeed, this court has had several occasions to confront the issue of whether the failure to instruct on an element of an offense automatically requires reversal of a conviction. In *White v. United States,* 613 A.2d 869 (D.C.1992) (en banc), we held that unless an objection is made at trial to the instructions as given, a failure to instruct on an element of an offense

> will not be the cause for a reversal at least where . . . the relevant facts are so

---

4. Appellant argues that the failure to instruct on an element of an offense is a "structural" error requiring automatic reversal. *See Arizona v. Fulminante,* 499 U.S. 279, 309, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). But as the Supreme Court explained in *Neder v. United States,* 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999), structural errors are a very limited class of cases involving errors "so intrinsically harmful as to require automatic reversal." *Id.* at 7, 119 S.Ct. 1827. Since the error does not require automatic reversal and was not objected to at trial, we

review for plain error. *See Thomas v. United States,* 914 A.2d 1, 4 (D.C.2006) ("In order to show that the nonstructural error in this case affected his substantial rights, appellant must show a reasonable probability that the [error] had a prejudicial effect on the outcome of his trial."), *cert. denied,* —— U.S. ——, 128 S.Ct. 241, 169 L.Ed.2d 160 (2007); *cf. Callaham v. United States,* 937 A.2d 141, 146 & n. 7 (D.C.2007) (applying harmless-error analysis to trial error where objection preserved claim).

closely related that no rational jury, shown by its verdict to have found the facts necessary to convict the defendant under the instructions as given, could have failed, if fully instructed on each element, to have found in addition the facts necessary to comprise the omitted element.

*Id.* at 870; *cf. Jenkins v. United States,* 877 A.2d 1062, 1069–70 (D.C.2005) (reversing under harmless-error analysis where appellant contemporaneously objected to erroneous jury instruction).

Applying this rule in *Bellamy v. United States,* 810 A.2d 401 (D.C.2002), we upheld the appellant's convictions for distributing cocaine in a drug-free zone, in that case within 1000 feet of a school, and possession of cocaine with intent to distribute in a drug-free zone, despite the trial court's failure to instruct the jury on the drug-free zone element of the charges. *Id.* at 402. In affirming the convictions, we found it critical that "the government's evidence showed that the crimes took place within 1000 feet of the school, and appellant did not dispute it." *Id.* at 407. Rather, the appellant's only defenses were his denial that he had sold any drugs and his assertion that the bags of cocaine found at his feet belonged to someone else or had been planted by the police. *Id.* at 403. Because the jury in *Bellamy* obviously did not believe the appellant's defense, and the only evidence in the case as to the proximity to the school was the undisputed testimony of the government's witnesses, we reasoned that, given the overwhelming evidence, no rational jury could have failed to find that the crimes occurred within a drug-free zone and therefore that "the error did not seriously affect 'the fairness,

integrity or public reputation of judicial proceedings.'" *Id.* at 407 (quoting *Johnson, supra,* 520 U.S. at 470, 117 S.Ct. 1544).[5]

■ Having demonstrated that the omission of an element of the offense from the jury instructions does not warrant automatic reversal, and that it does not *per se* satisfy the plain error test, we now analyze the issue before us under that test. The government concedes that the trial court committed error when it failed to instruct the jury on the intent element of Second–Degree Child Sexual Abuse. It further concedes that the error was plain or obvious. Thus, we address whether the error affected the appellant's substantial rights and whether this error seriously affected the fairness, integrity or public reputation of judicial proceedings. We conclude that it did not.

In order to show that the non-structural error in this case affected his substantial rights, appellant must show a reasonable probability that the error had a prejudicial effect on the outcome of his trial. *See United States v. Dominguez Benitez,* 542 U.S. 74, 81–82, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004) ("In cases where the burden of demonstrating prejudice (or materiality) is on the defendant seeking relief, we have invoked a standard with similarities to the *Kotteakos* [*v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)] formulation in requiring the showing of a reasonable probability that, but for [the error claimed], the result of the proceeding would have been different." (second alteration in original) (internal quotation marks omitted)). Just as the appellant in *Bella-*

---

5. *Accord Peterson v. United States,* 657 A.2d 756, 763 (D.C.1995) (holding that trial court's failure to instruct on the operability element of a charge of possession of a prohibited weapon did not warrant reversal because, based on the "circumstantial evidence" presented at trial, "no rational jury could have failed to find that the shotgun was operable if fully instructed").

my did not seriously dispute whether the element of the offense omitted from the instructions—*i.e.*, whether his actions took place in a drug-free zone—had been met, *Bellamy, supra*, 810 A.2d at 407, here appellant submitted no evidence nor made any argument to the jury contesting his intent.[6] In contrast, the government's evidence overwhelmingly supported the conclusion that appellant's actions were taken with the intent of gratifying himself sexually. Both daughters testified that appellant touched their thighs, buttocks, breasts and vagina, and both testified that the touching made them feel "uncomfortable." E.F. further testified that appellant told her that she needed to "comb [her] pubic hair," that he continued to try to touch her vagina even as she tried to stop him, and that he looked at her as a girlfriend rather than as a daughter. S.F. gave similar testimony concerning appellant's disregard for her requests that he stop touching her. She also testified that appellant would repeatedly state, "See how you do me" while

he touched her, a statement that the jury could reasonably infer was an expression of appellant's sexual arousal.[7] E.F. testified that appellant took nude photographs of her "more than 20 times," directing her to "get up on the bed and ... show your butt," "turn around and smile," and "pose like the girls in porno magazines."

Given this evidence, we conclude, in accord with *Bellamy*, that no rational jury could have found that appellant touched his daughters in a way consistent with the trial court's jury instruction on Second–Degree Child Sexual Abuse without also finding the requisite intent.[8] Just as the appellant in *Bellamy* never argued that he was not within a drug-free zone, the issue of intent in this case "was essentially uncontroverted at trial." *Johnson, supra*, 520 U.S. at 470, 117 S.Ct. 1544.[9] Appellant's trial counsel put it bluntly while discussing jury instructions, "They believe her if they believe her. If they don't, they

6. Appellant's counsel makes an effort to provide alternative intent arguments on appeal. For example, counsel hypothesizes that his client may have been playing with his daughters, tickling them, or may "have been concerned for their hygiene or health, as a father." These arguments are speculative, strain credulity, and are completely unsupported by anything in the record.

7. At oral argument, appellant's counsel maintained that the phrase "see how you do me" is not inherently sexual. While this may be true, the jury was not required to view the phrase in a vacuum. Given the context in which it was allegedly said, the phrase serves as strong evidence of appellant's intent to obtain sexual gratification.

8. Appellant asserts that, because the jury acquitted him of Incest and First–Degree Sexual Abuse, we cannot be certain what testimony it found to be credible. This argument fails, however, because the evidence needed to prove these crimes is distinct from that needed to prove Second–Degree Sexual Abuse. The jury verdict demonstrates that it unanimously credited the daughters' testimony rel-

evant to the charges of Second–Degree Sexual Abuse even if it did not find unanimously that the appellant was guilty of Incest and First–Degree Sexual Abuse. Similarly, the fact that the trial court failed to give the standard jury instruction regarding midtrial dismissal of charges does not warrant reversal. That failure in no way undermines the verdict as a reflection of the jury's determination that appellant had the requisite intent for a conviction of Second–Degree Sexual Abuse. *See* CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 1.17B (4th ed.1993). We further note that this issue is raised for the first time on appeal.

9. In *Bellamy* we acknowledged that "[t]he Supreme Court's decisions in *Neder* and *Johnson* may have some effect on our holding in *White*." 810 A.2d at 407 n. 8. We conclude here, as we did in *Bellamy*, that any differences in those tests would not affect the outcome of our plain error analysis. Therefore, "we need not decide in this case whether *Neder* and *Johnson* supersede *White*." *Id.*

don't." Here, it is clear that the jury believed the daughters' accounts that their father touched them for inappropriate reasons. Indeed, with no evidence to the contrary, a logical jury could not have concluded on this record that appellant lacked the requisite intent. Therefore, it cannot have affected appellant's substantial rights, and reversal for plain error is unwarranted.

### III. Failure to Define the Term "Lewd"

■ As his second claim of error, appellant, having not raised this issue before the trial court, now argues that the trial judge erred in failing to define the term "lewd" in the Sexual Performance Using a Minor statute. We conclude that the trial judge did note err in instructing the jury on this offense.

An individual is guilty of Sexual Performance Using a Minor "if knowing the character and content thereof, he or she employs, authorizes, or induces a person under 16 years of age to engage in a sexual performance." D.C.Code § 22–3102(1) (2001). "Sexual performance" is defined as "any performance or part thereof which includes sexual conduct by a person under 16 years of age." *Id.* § 22–3101(6). A "performance" is defined to include photographs. *Id.* § 22–3101(3).

"Sexual conduct" is defined to include a "lewd exhibition of the genitals." *Id.* § 22–3101(5)(E).

The instruction given by the trial court gave substantial guidance to the jury concerning the meaning of the term "lewd," a word that in any event is known in common parlance. The judge began by explaining, "In this case sexual conduct means a lewd exhibition of the genitals," and further instructed the jury that genitals "are defined as reproductive organs, in this case, the vagina." Next, he explained that the "lewd exhibition of the genitals means that the minor's genital or pubic area must be visibly displayed" and "mere nudity is not enough." Further, the trial judge noted that "the exhibition must have an unnatural or unusual focus on the minor's genitalia regardless of the minor's intention to engage in sexual activity or whether the viewer is sexually aroused." Thus, we conclude that the trial judge, while not specifically telling the jury that he was defining "lewd" for them, did a commendable job of explaining the meaning of the statute and giving them the guidance necessary to reach an informed verdict. We reject the idea that in order to define "lewd" adequately, the judge must use terms such as " 'lewd' means" or "the definition of 'lewd' is . . . ." [10]

10. We note also that the trial court's instruction is in accord with similar instructions from other jurisdictions. *See State v. Petrone,* 161 Wis.2d 530, 468 N.W.2d 676, 688 (1991) ("The photograph is lewd in its 'unnatural' or 'unusual' focus on the juvenile's genitalia, regardless of the child's intention to engage in sexual activity or whether the viewer or photographer is actually aroused."); *Asa v. Commonwealth,* 17 Va.App. 714, 441 S.E.2d 26, 29 (1994) (finding a lewd sexual exhibition where photographs focused on a girl's genitalia).

While some courts look to multiple factors to determine whether a photograph contains a lewd depiction of genitalia, one of the factors routinely considered is whether the picture focuses on the genitalia in an unnatural way. *See, e.g., United States v. Wolf,* 890 F.2d 241, 244 (10th Cir.1989) (listing several factors courts use in determining whether a visual depiction of a minor constitutes a "lascivious depiction of the genitals or pubic area," including "whether the focal point of the visual depiction is on the child's genitalia or pubic area;" "whether the child is fully or partially clothed, or nude;" and "whether the visual depiction is intended or designed to elicit a sexual response in the viewer") (citing *United States v. Dost,* 636 F.Supp. 828, 830 (S.D.Cal.1986)); *People v. Kongs,* 30 Cal. App.4th 1741, 37 Cal.Rptr.2d 327, 334–35

(Citing to the legislative history of the District of Columbia Protection of Minors Act of 1982, D.C.Code §§ 22–3101–3104 (2001)), and to *Black's Law Dictionary* 927 (8th ed.2004), appellant argues that "lewd" is a synonym for "obscene," and therefore the trial court should have instructed the jury that they could find the photographs "lewd" only if the government showed that "the average person, applying contemporary community standards to a work taken as a whole, could conclude that the [photographs appealed] to the prurient interest in sex, portrays sexual conduct in a patently offensive way, and lacks serious literary, artistic, political, or scientific value." D.C. Council, Capsule Legislative History, Bill 4–305, at 3–4 (1981) (citing *Miller v. California,* 413 U.S. 15, 24, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973)). In arguing for this definition of lewd, however, appellant ignores the entire purpose of the law, which was to provide greater protection to children by following the example of many states that had "enacted statutes similar to the promised measure, *which do not require proof that material is obscene,* but simply prohibit using or permitting children to be filmed, photographed, or displayed while engaged in specifically defined sexual conduct." *Id.* at 4 (emphasis added). The Committee of the Judiciary noted before passage of the Act that the Supreme Court had recently held such measures constitutional. *Id.* at 4–5 (citing *New York v. Ferber,* 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982)); *see*

*also Kongs, supra,* note 10, 37 Cal.Rptr.2d at 331. We decline appellant's invitation to adopt a definition of "lewd" at odds with the expressed intent of the legislature and conclude that there was no error in the instruction.

### IV.

■ Appellant's final contention is that there was insufficient evidence to support his conviction for Sexual Performance Using a Minor. In reviewing this claim, we must "view[ ] the evidence in the light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact." *Gibson v. United States,* 792 A.2d 1059, 1065 (D.C.2002) (internal quotation marks omitted). It is only where there is "no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt" that the evidence is insufficient to support a conviction and the trial court should grant judgment as a matter of law. *Id.* at 1065 (quoting *Williams v. United States,* 357 A.2d 865, 867 (D.C.1976)).

Appellant's primary contention is that "[t]here was no evidence of a lewd exhibition of the genitals, only evidence that nude pictures were taken of a minor." This assertion is inaccurate. E.F. testified that appellant photographed her nude on twenty separate occasions, and that he specifically photographed her genitals on five of those occasions.[11] Furthermore,

---

(1994) (noting that the *Wolf* factors are useful in applying the California Penal Code). These courts have specifically held that a depiction does not need to meet every factor in order to be lewd. *See, e.g., Wolf, supra,* 890 F.2d at 247 ("[W]e hold that not all of the *Dost* factors need be present in order for a sexually exploitive photograph of a child to come within the constitutional reach of the statute."); *Kongs, supra,* 37 Cal.Rptr.2d at 335. Moreover, the record in this case contains evidence

to support the presence of other enumerated factors, such as the children being naked and the pictures being taken to elicit a sexual response from appellant.

11. Throughout his brief, appellant notes that many of the questions the prosecutor asked about specific body parts were leading. There was no objection, however, to the form of these questions.

E.F. testified that appellant told her to "show [her] butt," turn around and smile, and "pose like the girls in porno magazines," who E.F. thought posed in "very disgusting" fashions. Examined in the light most favorable to the government, this testimony supports a reasonable inference that at least five of the pictures appellant took of E.F. focused on her genitalia. Pursuant to the jury instructions discussed above, this evidence was sufficient to support appellant's conviction.[12] For the foregoing reasons, appellant's convictions are

*Affirmed.*

12. Appellant argued at trial that the evidence was insufficient because none of the photographs allegedly taken was presented at trial. (One photograph was shown to S.F. at trial, but, contrary to her grand jury testimony, she denied that the photograph was of her.) This argument is unavailing. Requiring the government to produce the photographs that were taken would place the only evidence sufficient for a conviction in the exclusive possession of the suspect, who could become aware of an investigation into his activities before his arrest and destroy the evidence. *See State v. Lubotsky,* 148 Wis.2d 435, 434 N.W.2d 859, 861 (1988) ("Certainly, the person who takes numerous lewd photographs and is able to dispose of them, perhaps for profit, is no less culpable than someone with one lewd photograph hidden in a wallet."); *see also Frantz v. Commonwealth,* 9 Va.App. 348, 388 S.E.2d 273, 276–77 (1990) (maintaining that, in order to sustain convictions under Virginia's solicitation and encouragement statute where none of the photographs allegedly taken were available, "the photographs *as described by the boys* must have represented 'lewd exhibition[s] of nudity'" (quoting VA.CODE ANN. § 18.2–374.1(A)) (emphasis added)).