[Cite as *State v. Voltz*, 2022-Ohio-4351.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
JEFFERSON COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

PAUL STANLEY VOLTZ,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 21 JE 0020**

---

Criminal Appeal from the
Court of Common Pleas of Jefferson County, Ohio
Case No. 20-CR-131

**BEFORE:**
Gene Donofrio, Cheryl L. Waite, David A. D'Apolito, Judges.

---

**JUDGMENT:**
Affirmed in Part, Reversed in Part.

---

*Atty. Jane M. Hanlin*, Jefferson County Prosecutor, 16001 Ohio Route 7, Steubenville, Ohio 43952 for Plaintiff-Appellee and

*Atty. Bradley P. Koffel*, Koffel, Brininger, Nesbitt, 1801 Watermark Drive, Suite 350, Columbus, Ohio 43215 and *Atty. Paul Giorgianni*, Giorgianni Law LLC, 1538 Arlington Avenue, Columbus, Ohio 43212 for Defendant-Appellant.

Dated:  November 30, 2022

**Donofrio, P. J.**

{¶1}    Defendant-Appellant, Paul Stanley Voltz, appeals from a July 22, 2021 entry by the Jefferson County Common Pleas Court sentencing him to an aggregate term of life in prison after a jury convicted him of seven counts of rape, two counts of gross sexual imposition (GSI), and two counts of pandering obscenity. The convictions stem from the testimony of EA and BA, appellant's former stepchildren, who reported for the first time in 2020 as adults that appellant had sexually abused them when they were young children. CS, a childhood friend of EA and BA, also testified and reported for the first time in 2020 that appellant sexually abused him when he was a young child.

{¶2}    On October 7, 2020, the Jefferson County Grand Jury issued an indictment charging appellant as follows:

> Count 1 rape by oral sex with EA (born 11/3/95), a child under the age of 13 in violation of R.C. 2907.02(A)(1)(B), with a force specification (felony of the first degree);
>
> Count 2 rape by vaginal intercourse with EA, in violation of R.C. 2907.02(A)(1)(B), with a force specification (felony of the first degree);
>
> Count 3 pandering obscenity in violation of R.C. 2907.321(A)(5) (felony of the second degree);
>
> Count 4 GSI as to EA in violation of R.C. 2907.50(A)(4) when she was under the age of 13 (felony of the third degree);
>
> Count 5 rape by oral sex with BA (born 1/27/92), who was under the age of 13, in violation of R.C.2907.02(A)(1)(B), with an additional age specification for BA being under the age of 10 and a force specification (felony of the first degree);
>
> Count 6 GSI as to BA, in violation of R.C. 2907.05(A)(4), with age and force specifications (felony of the third degree);

Count 7 rape by oral sex with CS (born 10/13/1995) in violation of R.C. 2907.02(A)(1)(B), with age and force specifications, as CS was under the age of 13 at the time (felony of the first degree);

Count 8 anal rape of CS in violation of R.C. 2907.02(A)(1)(B), with an additional age specification as CS was under 10, and a force specification (felony of the first degree);

Count 9 anal rape of CS in violation of R.C. 2907.02(A)(1)(B), with age and force specifications (felony of the first degree);

Count 10 anal rape of CS in violation of R.C. 2907.02(A)(1)(B), with age and force specifications (felony of the first degree); and

Count 11 pandering obscenity in violation of R.C. 2907.321(A)(5) (felony of the second degree).

{¶3} The indictment alleged that all offenses occurred between 1998 and 2010, with the offenses against EA occurring between 1999 and 2010, offenses against BA between 1998 and 2010, and offenses against CS between 1998 and 2003.

{¶4} At trial, KC, the mother of EA and BA, testified that she and appellant were married in October 1998, when BA was six years old and EA was two years old. (Tr. at 220-221). KC stated that she and appellant separated in 2007. (Tr. at 225-229). She indicated that EA and BA had a childhood friend, CS, who was the same age as EA. (Tr. at 244-246). CS would often come to the house to play with EA and BA. (Tr. at 244-246). KC testified that during the marriage, she worked at a pediatric office and appellant was a special education teacher who was home during the summers and watched the children while she was at work. (Tr. at 223-224).

{¶5} KC also testified that she was prescribed pain pills during the marriage for an injury and she kept the pills in the house. (Tr. at 231-232). She testified that appellant sometimes drank to excess and viewed pornography on a computer in the recreation room in the basement. (Tr. at 229-231). She noted that they kept a camcorder in the rec room as well. (Tr. at 231).

Case No. 21 JE 0020

{¶6} KC testified that in 2017, BA came to her when he was a sophomore in college and disclosed that appellant had sexually abused him when he was a child. (Tr. at 233-234). KC stated that BA was ashamed and afraid that appellant would discover that he had disclosed the abuse. (Tr. at 235). She related that BA would not allow her to contact the police, as he was not ready to disclose and needed time to heal. (Tr. at 235). KC also stated that she was still close with appellant's family at this time, so she texted appellant's niece, Alanna Waggoner, who was around EA's age, and asked her if appellant had sexually abused her. (Tr. at 239). Alanna responded that appellant did not abuse her and she observed nothing inappropriate at the home of KC and appellant when she visited as a child. (Tr. at 479-480).

{¶7} KC testified that EA came to her in 2020 and disclosed that appellant had also sexually abused her when she lived with them. (Tr. at 240). KC explained that she did not report this disclosure immediately because EA told her that she would do so when she was ready. (Tr. at 241-242).

{¶8} KC testified that CS often came to their house when he was a child and stayed overnight. (Tr. at 245-246). She stated that it was often appellant's idea to have CS over and he acted as if CS was the stepson that he always wanted. (Tr. at 247). She related that there came a time when CS was not allowed to come over, but then when he was allowed to return, his visits had to be supervised. (Tr. at 249). She explained that CS's mother called her and told her that CS stated that he and BA were told that they could not leave the couch at BA's house until they took BA's medication. (Tr. at 247). KC testified that BA took no medications at that time. (Tr. at 247).

{¶9} On cross-examination, KC testified that appellant was her third husband and she had an abusive relationship with another man after separating from appellant. (Tr. at 258). KC also testified that after BA's disclosure, she texted Alanna Waggoner and told her that appellant had sexually abused BA. (Tr. at 261). KC asked Alanna if appellant had sexually abused her and KC told Alanna that BA was seeing a counselor. (Tr. at 261-262). KC testified that Alanna told her that she was not abused, she was fine with appellant, and he never did anything inappropriate to her. (Tr. at 263).

{¶10} EA then testified. (Tr. at 279). She stated that she was 25 years old and she first disclosed appellant's sexual abuse to her boyfriend while she was in college. (Tr.

at 284). She remembered that when appellant was married to her mother, appellant played "superman" with her, where he would sit her on top of him and rock her back and forth, rubbing up on his erect penis. (Tr. at 285-286). She also recalled appellant forcing her to perform oral sex on him in the shower located in the basement of their house. (Tr. at 286). She recalled him ejaculating into her mouth. (Tr. at 287). She also remembered a time in the shower when appellant pushed his penis into her vagina and it slipped out. (Tr. at 286-287). She recalled vaginal intercourse with appellant. (Tr. at 288). She also stated that appellant would instruct her and CS on how to perform sexual acts on one another and he would record them on his handheld video camera and masturbate. (Tr. at 288-289).

{¶11} EA testified that she did not disclose the abuse to anyone at the time because appellant threatened to kill her mother if she did. (Tr. at 290). She stated that appellant gave her white, chalky, circular pills on occasion and she would feel woozy, like a ragdoll. (Tr. at 291). She was not on any medication at that time. (Tr. at 292). She explained that after her brother disclosed his abuse to her mom, she decided to do so as well. (Tr. at 293). She related that when she decided to go to law enforcement, she texted BA and CS about going forward together. (Tr. at 297). She indicated in her texts that she stated that she had "talked to a lawyer that is down to take the case." (Tr. at 297). She explained that this lawyer was the assistant prosecuting attorney in this case, who was a friend of her mother. (Tr. at 297-298). She testified that they then set a date of August 28, 2020 and went to the Jefferson County Sheriff's Office and met with Deputy Susan Bell. (Tr. at 301).

{¶12} On cross-examination, EA testified that her first memory of sexual abuse by appellant occurred when she was a sophomore in college. (Tr. at 311). She stated that her first memory was the "superman" game and this was triggered when BA said that he had been molested. (Tr. at 317). She clarified that she had not directly spoken to the assistant prosecutor like she related in the texts to BA and CS, but her mother had done so. (Tr. at 314). She testified that she had a second memory of the abuse in the shower a year-and-a-half later, when she was trying to have sex in the shower with her boyfriend at the time. (Tr. at 316). EA acknowledged that after her mother and appellant separated, she called appellant and invited him to a function at her middle school, invited him to her

soccer game when she was a high school freshman, and invited him to her high school graduation. (Tr. at 325-326).

{¶13} On redirect, EA testified that all of the sexual abuse by appellant occurred during appellant's marriage to her mother and ended by the time that she was in fifth grade. (Tr. at 333).

{¶14} CS then testified. (Tr. at 337). He related that he knew EA and BA since the age of five or six, he was now 25 years old, and a college graduate. (Tr. at 340-341). He recalled meeting appellant for the first time as the stepfather of EA and BA and remembered the first inappropriate occurrence with him when he repeatedly urged EA and CS to kiss when they were at a lake. (Tr. at 344). He remembered appellant showing pornography to him, EA, and BA. (Tr. at 345). He also recalled seeing BA shower with appellant in the basement, seeing appellant force BA to perform oral sex on him, and he saw appellant performing oral sex on BA. (Tr. at 347). He also remembered appellant doing the same with him in the shower when he was seven years old. (Tr. at 347-348).

{¶15} CS also testified that appellant instructed EA to perform oral sex on CS and appellant recorded sexual acts between EA and CS, including oral and vaginal sex. (Tr. at 349). He recalled seeing appellant video recording the acts and telling them that they were movie stars. (Tr. at 349-350). CS stated that he could not refuse to perform these acts as appellant threatened to kill his parents. (Tr. at 350). CS testified that appellant told him that he knew where CS's mother worked and he would break her neck if CS told. (Tr. at 350). CS testified that appellant anally raped him two or three times when he was around seven years old and told him that he could not fully penetrate CS's anus or people would know. (Tr. at 351-352). He also recalled appellant forcing him and BA to wrestle and the loser had to perform sex acts with appellant. (Tr. at 353). He recalled always winning, except once when appellant said it was not fair and then anally raped him. (Tr. at 353). He recalled appellant giving him white pills that made him feel funny. (Tr. at 354).

{¶16} CS further testified that he kept returning to the house despite the abuse because he was afraid that appellant would kill his parents and he did not want to raise suspicion by refusing to go. (Tr. at 356). He related that in 2019, he first told his parents about the abuse when they were out to dinner and his dad stated that he saw appellant.

(Tr. at 357). CS stated that he did not tell law enforcement at that time because he was not ready to do so. (Tr. at 358).

{¶17}   On cross-examination, CS acknowledged telling police that "[appellant] did something to me that traumatized me so bad that I don't even remember it." (Tr. at 369). He also acknowledged stating to Deputy Bell that he "never told anybody because I didn't remember. I didn't remember this until I was like twenty or twenty-one." (Tr. at 369). He recalled telling deputies that the sexual abuse ruptured his testicle but he never had it examined. (Tr. at 371). He acknowledged meeting with EA in 2019 to talk about the abuse, and he spoke to BA on the phone about it in 2016 or 2017. (Tr. at 372). They talked about going to the police, but BA said he could not do so at that time. (Tr. at 373).

{¶18}   BA then testified. (Tr. at 405). He stated that he was 29 years old and was about six years old when his mom married appellant. (Tr. at 410). His earliest memory of abuse occurred when he was seven or eight years old when appellant instructed him on how to touch appellant and he recalled performing oral sex on him in the basement shower. (Tr. at 411). He recalled appellant threatening him that if he told, appellant would be harder on EA and hurt his mother. (Tr. at 412). He remembered appellant showing him pornography in the basement and he was unable to estimate the number of times that he was abused, except that it was when his mother was not home and appellant was watching him. (Tr. at 415). He vaguely remembered appellant giving him a small, chalky, white pill that made his eyelids and limbs feel heavy, and made him feel like he was in a bubble underwater. (Tr. at 415).

{¶19}   BA testified that he began recalling the abuse when he was talking with his girlfriend, now his wife, and she was telling him about an assault that she had suffered. (Tr. at 416). He disclosed to his mother and he testified that he could not go to law enforcement at that time because he was not confident about the story and felt that it did not matter. (Tr. at 416). He testified that he eventually went to see Deputy Bell with EA and gave an interview and statement. (Tr. at 417). He noted that as he got older, appellant stopped abusing him sexually, but was more degrading. (Tr. at 417-418).

{¶20}   Deputy Bell testified. (Tr. at 442). She stated that she and another officer, who had since passed away, interviewed KC, EA, CS, and BA, all separately. (Tr. at 442). She related that she and the other officer interviewed appellant thereafter on September

1, 2020. (Tr. at 442). She testified that when appellant arrived for the interview, he was not told who made the sexual abuse accusations against him and he did not ask. (Tr. at 443). When they told him of the substance of the allegations, he repeatedly denied them and said that he did play "superman" with EA. (Tr. at 444). When they asked if he could have done things to the children when he drank excessively, appellant responded that he used to drink hard liquor and sometimes he was not aware of things that happened. (Tr. at 445).

**{¶21}** Deputy Bell testified that based upon her 32 years of investigative experience with child sexual abuse, children sometimes are unable to recall things that happened to them and they recall these things later. (Tr. at 446-447). On cross-examination, Deputy Bell testified that police searched appellant's home and seized a computer, a video camera and cell phones. (Tr. at 451-452). She stated that she did not participate in the seizure and investigation of these devices, but she would have known if they turned up pictures of EA, CS, or BA on them. (Tr. at 452). Deputy Bell also testified that appellant voluntarily appeared for a police interview, he stated that he could not admit to things he did not do, and he stated that he would talk to his attorney before he would agree to take a polygraph test. (Tr. at 455). She acknowledged that no physical evidence existed to support the claims of abuse. (Tr. at 456).

**{¶22}** On redirect examination, Deputy Bell testified that appellant never took a polygraph test and the accusers were never asked to do so. (Tr. at 458-459). She also related that appellant told her that he did not recall doing the acts that he was accused of; he was a 50-year-old man and would know if he showered with kids, and if he had been really drunk, he might not have been able to perform the sex acts. (Tr. at 459).

**{¶23}** Appellant presented two witnesses on direct examination: Alanna Waggoner, his niece; and Jason Van Dyke, the son of appellant's current girlfriend. (Tr. at 476-498). Alanna testified that she was currently 30 years old, appellant was her mother's brother, and she often visited appellant and KC at their home when she was a child. (Tr. at 476). Alanna indicated that she had been in contact with KC even after KC and appellant separated, and she acknowledged copies of text and Facebook Messenger messages that KC had sent her in 2017. (Tr. at 476-477). Alanna testified that in those messages, KC asked Alanna if appellant had ever abused her. (Tr. at 479). Alanna

testified that she never observed anything inappropriate at KC and appellant's house and she never saw pornography there. (Tr. at 479-480).

**{¶24}** Appellant's counsel proceeded to ask Alanna if she knew or had an opinion as to why KC sent her the messages. (Tr. at 480). The prosecution objected, and the trial court sustained the objection. (Tr. at 480). A sidebar was held, and counsel discussed whether Alanna could respond as to why KC had sent her the messages. The trial court sustained the objection, ruling that Alanna could not know KC's motives in messaging her and allowing her to testify to this would be speculation and hearsay. (Tr. at 481-483).

**{¶25}** Jason Van Dyke, the 21-year-old son of appellant's current girlfriend, testified. He stated that that he considers appellant his stepdad even though appellant and Jason's mother never married. (Tr. at 486). He lived with appellant and his mother since the age of 13 and he had moved out within the last year. (Tr. at 487). He called appellant his "best father figure," since his biological father was absent. (Tr. at 486).

**{¶26}** As appellant's counsel began asking Jason if he had observed anything inappropriate, the prosecution objected. The court held a sidebar. (Tr. at 487). Appellant's counsel put the sidebar discussion on the record. (Tr. at 488).

**{¶27}** On June 9, 2021, after a two-day trial, the jury found appellant guilty on all charges, which were the seven counts of rape with age and force specifications, two counts of pandering obscenity involving a minor, and two counts of GSI. The court held a sentencing hearing and on July 22, 2021, filed a judgment entry sentencing appellant to consecutive life sentences on each of the rape convictions, eight years in prison on each pandering obscenity conviction, and five years in prison on each GSI conviction. The court ran the rape sentences consecutive to one another, and ran the other sentences concurrently to the rape sentences, and to one another, resulting in an aggregate term of life in prison. The court also designated appellant a Tier III Sex Offender for each of the rape convictions.

**{¶28}** On August 9, 2021, appellant filed a notice of appeal to this Court asserting seven assignments of error.

**{¶29}** Appellant's first assignment of error states:

> **The trial judge erred by excluding evidence of Mr. Voltz's good character. (Tr. 490:10-14, 492:12-496:16).**

**{¶30}** Appellant asserts that the trial court abused its discretion when it barred him from asking Jason Van Dyke if he had observed bad conduct or sexual comments by appellant during the time that they lived together, or if he would trust appellant with children. Appellant contends that the trial court also erred by barring him from presenting other witnesses who would have testified that they trusted him with their children. He submits that the trial court's exclusion of this good character evidence violated his constitutional right to present a defense.

**{¶31}** Appellant asserts that the proffered testimony is character evidence of an accused and is admissible under Evid. R. 404(A)(1). He asserts that Evid. R. 404 protects the accused against "the propensity inference," but the accused can waive that protection. Appellant cites the 1980 Staff Note to Evid. R. 404, which states:

> Rule 404(A)(1) Character of the Accused
>
> The first exception to the general rule of inadmissibility is the limited use of evidence of a character trait of the accused. The basic rule is that the defendant may, at his option, offer evidence of his good character as proof that he did not commit the act charged because such conduct is not in accord with his character. This is often denominated the "mercy defense". If the accused offers evidence of his good character, then and only then, can the prosecution offer evidence of the bad character of the accused. The rule is in accord with existing Ohio law. R.C. 2945.56; *State v. Markowitz*, 138 Ohio St. 106 (1941).

**{¶32}** Appellant also cites *State v. Workman*, 14 Ohio App.3d 385, 391, 471 N.E.2d 853 (8th Dist. 1984) as support for allowing his witnesses to testify that they trusted him with their children and he was excellent with them. Appellant contends that the testimony of his defense witnesses would have created reasonable doubt, especially when no physical evidence existed of the crimes, the alleged conduct happened years ago, and the case rests solely upon accuser testimony.

**{¶33}** Appellant's counsel put the following on the record concerning the sidebar held after the prosecution objected to his question to Jason Van Dyke:

MR. MCNAMARA [appellant's counsel]: The last question was going to be, "Did you ever observe anything inappropriate during the seven years or so you lived with Paul Voltz?"

Before I could finish the question, the prosecutor correctly anticipated that it was going to be about the same as the question I had asked Alanna Waggoner earlier and objected.

We had a conference at the bench off the record. The Court instructed me that I could not ask him anything about whether there was pornography in the house, whether there were bad deeds done in the house, or anything because it is a different house than where Paul Voltz lived back in the early - - early 2000's, excuse me; and that if I did, then other unrelated bad acts evidence could come in from the State.

I just wanted to make a record of that, of what the question was I wanted to ask - - or questions were, and what the Court's ruling was.

THE COURT: Okay. So we're clear on that - - Do you want to correct the record?

MS. HANLIN: No. I think that's accurate.

> The testimony from this witness so far is, he was thirteen years old when this Defendant began a relationship with his mom, which is older than all three of the Defendants[sic] were at the time that this abuse was alleged.

> Additionally, there's been testimony from BA that the Defendant grew less sexually interested in him as he reached puberty.

The two households have nothing to do with one another. Whether or not Mr. Voltz did or did not molest this thirteen-year-old had nothing to do with whether or not he did or did not molest three kids under the age of thirteen in the 1990's.

MR. MCNAMARA: I would disagree, because BA was fifteen at the end of 2007, the period in the Indictment.

THE COURT: Well - -

MR. MCNAMARA: He was much younger than that when he started living with Paul.

THE COURT: BA testified that once he started puberty is when things changed from sexual abuse to other forms of abuse.

Be that as it may, to ask whether or not this victim was abused or shown pornography completely confuses the issues. It's other acts. I'm not going to allow that line of questioning, to be clear on what my ruling is.

(Tr. at 488-490). After the examination of Jason concluded, defense counsel consulted with appellant and a subsequent sidebar was held:

MR. MCNAMARA: I have subpoenaed, and the Court file will reflect the names, several other witnesses.

THE COURT: Yes.

MR. MCNAMARA: Including a next-door neighbor that runs a daycare.

THE COURT: Okay.

MR. MCNAMARA: Other relatives, other people that involve testimony very similar to what this young man was going to

give and what Alanna was going to give that the Court isn't going to allow me to present. I'm not going to call them.

THE COURT: I'm not going to allow you to ask if he's raped or abused anybody else. That's what I'm not going to allow.

MR. MCNAMARA: Okay. It's not just raped or abused, but any sexual comments, conduct. They would say no.

THE COURT: Any conduct that is at issue in this case.

MR. MCNAMARA: Yes. They would, in fact, say that they would trust their kids with Paul, and that's what I was going to do. But I think it would be a waste of time in view of the Court's rulings for me to parade them in and out, so I don't want to do it.

THE COURT: Well, I don't want - - I don't know what else you could ask them, but I'm not going to preclude you from putting on more witnesses.

MR. MCNAMARA: There isn't anything else I was going to ask them.

THE COURT: Ms. Hanlin?

MS. HANLIN: I agree. I think the ruling would be the same. I think none of these people have any firsthand knowledge about the facts that are at issue before the court now.

MR. MCNAMARA: That's correct.

MS. HANLIN: I think the danger for the Defendant is that if one of these people says, "Oh, he would never do anything like that," or "I would leave my daughter with him," the next question out of my mouth is going to be, "even if he got fired for inappropriately texting a young girl?"

I don't see a way around that. I think once you bring in people to start saying he's a great guy, I think everything is fair game at that point.

THE COURT: Well, I mean if - - I don't know how the Court keeps him from putting someone on the stand and says, "Is he your neighbor? Any problems with your neighbor?" or "Is he a good neighbor?" I don't know how I keep that out. That may walk the fine line, and at some point in time, you may cross that line in opening the door to character evidence.

MR. MCNAMARA: Well, it would be character evidence.

THE COURT: Yes.

MR. MCNAMARA: So that's why I should just make a record that I'm not calling them, even though subpoenaed, because it would duplicate the last two witnesses. Well, Alanna Waggoner was different because she received the text, but it would be the kind of character evidence that we're talking about, that he never -- they would trust their children with him, that sort of thing.

THE COURT: The Court's ruling is, I'm going to follow the rules of evidence, and you present your case however you see fit.

MR. MCNAMARA: All right.

THE COURT: But the Court is not going to allow any prior bad acts or anything that would violate 404(B) or that would invite error in that regard.

MR. MCNAMARA: Or any prior good acts on our side. We aren't presenting prior bad acts, but you're saying that if we do this- -

THE COURT: If you want to present character evidence, I'm telling you that is going to open the door for - -

MR. MCNAMARA: Okay.

THE COURT: - - the State.

MR. MCNAMARA: We're good then.

(Tr. at 492-496).

**{¶34}** The trial court did not bar appellant's counsel from calling witnesses to testify about appellant's good character. The court did rule that it would not allow defense counsel to "ask if he's[appellant] raped or abused anybody else. That's what I'm not going to allow." (Tr. at 493). The court also stated that it would not permit appellant's counsel to ask witnesses about "[a]ny conduct that is at issue in this case." (Tr. at 493).

**{¶35}** However, when appellant's counsel stated that he would not waste time by calling additional character witnesses in light of the court rulings, the court specifically stated that it was not barring counsel from calling witnesses. (Tr. at 493-494). The court stated that it could not prevent counsel from asking witnesses if appellant was a good neighbor or if they had problems with him. (Tr. at 493-495). The court cautioned that asking such questions may open the door for the prosecution to present character or other acts evidence to rebut the testimony of appellant's witnesses. (Tr. at 495). The court concluded that "[t]he Court's ruling is, I'm going to follow the rules of evidence, and you present your case however you see fit." (Tr. at 495). The court reiterated that it was not going to allow prior bad acts "or anything that would violate 404(B) or that would invite error in that regard." (Tr. at 496). Accordingly, the trial court did not bar appellant's counsel from presenting his character witnesses.

**{¶36}** Appellant is correct that the court did bar appellant's counsel from asking Jason Van Dyke about whether he observed any inappropriate conduct, sexual comments, or pornography when he lived with appellant. In doing so, the court explained that it "confuses the issues. It's other acts." (Tr. at 490). The court also made clear that it would not allow defense counsel to ask defense witnesses about specific acts committed or not committed by appellant.

**{¶37}** We find that the trial court did not abuse its discretion by making this ruling.

**{¶38}** Evid. R. 405 provides:

(A) Reputation or Opinion. In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.

(B) Specific Instances of Conduct. In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of his conduct.

**{¶39}** Under the Rule, only reputation or opinion evidence is permissible character evidence on direct examination and specific acts may be raised only on cross-examination, unless character or a trait of character is an essential element of a charge. *See also State v. Collier*, 12th Dist. No. CA2003-11-282, 2005-Ohio-944, ¶18. Character is not an essential element of the charges in this case. Therefore, the trial court properly ruled that asking witnesses about whether they observed instances of inappropriate behaviors by appellant, pornography, or sexual comments, is improper specific acts evidence used on direct examination.

**{¶40}** Further, the trial court did not bar defense counsel from asking additional questions of Jason Van Dyke, such as his opinion of appellant or whether he would trust appellant with children. Nor did the trial court bar counsel from presenting additional character witnesses. The court warned appellant's counsel that asking such questions may open the door for the prosecution to present other bad acts of appellant. Counsel then chose not to present additional witnesses and ask questions that could have demonstrated appellant's good character without delving into other acts evidence. Appellant's counsel could have asked Jason and the other witnesses about appellant's reputation or asked their opinions about him and whether they trusted appellant with children on direct examination.

**{¶41}** Accordingly, appellant's first assignment of error is without merit and is overruled.

**{¶42}** In his second assignment of error, appellant asserts:

**The prosecutor's closing argument violated the Fifth Amendment Self-Incrimination Clause. (Tr. 539:5-541:15).**

**{¶43}**    Appellant contends that his right against self-incrimination was violated when the prosecution made the following statements on rebuttal during closing argument:

> Can you forgive them [the accusers] for being angry that it has come to this? He finds it –Mr. McNamara – quote, impossible for these things to have happened. Impossible according to who? They didn't say that these things happened when they were five. They said these things happened when they were seven. Impossible why, because Mr. McNamara says so?

> The other party in this case that has the right to call any witness to the stand that they want is the Defendant. He can call any witnesses he wants. Did any witness come to the stand and tell you that these [accusations] are impossible?

(Tr. at 539). Appellant's counsel objected, stating that the prosecution had "objected and stopped our witnesses from testifying about those things." (Tr. at 539). The prosecution responded that, "[t]here was no witness who was going to testify that this was impossible." (Tr. at 539). The court asked counsel to approach the bench and the following dialogue occurred:

> THE COURT: The objection?

> MR. MCNAMARA: Well, she's implying bad character after objecting to the evidence of good character that we were trying to - -

> MS. HANLIN: No, I'm not.

> MR. MCNAMARA: - - present.

> MS. HANLIN: No. I'm not. His words were that it was impossible that this abuse happened. That has nothing to do with his

witnesses, none of whom were present for any of the alleged abuse.

THE COURT: I think his objection was to that comment that he could have called witnesses.

MR. MCNAMARA: Yes, and they would have all said, "It's impossible for him to have done it. He's not that kind of guy."

MS. HANLIN: They would never have been permitted to testify to that. They would never have been permitted to testify during some period of time, where they were neither present nor where they lived, that something did or didn't happen.

THE COURT: I get that. I don't want any - - I don't even want a hint of - - the Jury could have construed that it's why the Defendant didn't testify, and I don't want any  - -

MS. HANLIN: No.

THE COURT: - - hint of that at all. So I'm going to ask you to move on - -

MS. HANLIN: Yes.

THE COURT:  - - and get off of that.

MS. HANLIN:  Okay.

Tr. at 540-541.

{¶44} Appellant quotes the Fifth Amendment protection against self-incrimination and cites cases holding that it is "improper for a prosecutor to comment upon a defendant's failure to testify." *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, ¶ 103 (citing *Griffin v. California*, 380 U.S. 609, 613, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). Appellant acknowledges that a prosecutor may comment on a defendant's failure to present evidence to support his case. *State v. Collins*, 89 Ohio St.3d 524, 527, 2000-

Ohio-231. However, he asserts that the trial court is in the best position to oversee the prosecution's closing argument and the court here even noticed that the jury could have construed the prosecution's statement as commenting on his failure to testify.

Appellant asserts that "[i]nference and context matter," and he notes that a prosecutor's statements need not directly or specifically refer to a defendant's failure to testify. Citing *Gapen,* appellant asserts that the standard is whether the prosecutor's closing statement "was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *Id.* at 103. He refers to two aspects of the prosecution's statements that met that standard.

**{¶45}** Appellant first notes that the prosecution addressed witness testimony rather than physical evidence when it stated that he "has the right to call any witness to the stand" and he failed to present any witness testimony "to tell you that these [accusations] are impossible." (Tr. at 539). He points out that had the State referred to a lack of exonerating physical evidence rather than witness testimony, less risk existed of a jury interpreting the comment to be a statement concerning his failure to testify. *State v. Foth*, 10th Dist. Franklin No. 95APA12-1621, 1996 WL 465250 (Aug. 15, 1996)(where evidence not overwhelming and verdict turned on credibility of witnesses, prosecution's six comments in closing argument suggesting that the jury could infer that appellant was guilty from the fact that he contacted an attorney violates appellant's Sixth Amendment right to counsel).

**{¶46}** Appellant also contends that the context of the prosecution's comment suggested that he was one of the witnesses who failed to testify. He notes that the comment did not mention his family and their failure to testify, or his friends, neighbors, or coworkers. Rather, the prosecution referred to only two people: appellant and counsel. Appellant further contends that the prosecution's comments were not harmless error because they were presented in rebuttal and he thus had no opportunity to counter them.

**{¶47}** This assignment of error is without merit. The Fifth Amendment provides that "No person…shall be compelled in any criminal case to be a witness against himself." The state "may comment on the failure of the defense to offer evidence in support of its case." *State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, 114 N.E.3d 1092, ¶ 184, citing *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, at ¶ 293.

"Such comments do not imply that the burden of proof has shifted to the defense, nor do they necessarily constitute a penalty on the defendant's exercise of his Fifth Amendment right to remain silent." *Id.*, quoting *Collins*, 89 Ohio St.3d at 527–528, 733 N.E.2d 1118.

**{¶48}** Further, the prosecution may comment on a defendant's failure to call witnesses. *Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, 114 N.E.3d 1092, at ¶ 184. In *Wilks*, the Ohio Supreme Court found it permissible for the prosecution to state in closing argument that the defense failed to call a particular witness and failed to call any other witness. *Id.* at ¶ 185. The Court found that the prosecution may reiterate on rebuttal that the defense had the right to call witnesses, just like the State. *Id.* at ¶ 186.

**{¶49}** Here, the transcript shows that the assistant prosecutor did not directly comment on appellant's failure to testify. She stated that the defendant had the right to call any witness to the stand and she asked the jury if any witness had taken the stand to testify that the accusations against appellant were impossible. These statements do not rise to the level of commenting on appellant's failure to testify.

**{¶50}** Further, the prosecution's statements are not such that "the jury would naturally and necessarily" construe them as comments on appellant's failure to testify. The statements are similar to those made in *Wilks* in that they concerned appellant's lack of presentation of evidence through witness testimony. While the trial court did state at sidebar that "the Jury could have construed that is why the Defendant didn't testify," this statement is part of a longer statement that was preceded and followed by the court's indication that it did not want any "hint" of commenting on appellant's failure to testify. (Tr. at 541). Accordingly, the court was stressing to the prosecution that it should be careful to avoid any comment close to being a comment on appellant's failure to testify.

**{¶51}** In addition, defense counsel's objection during closing was not based on the prosecution's statements constituting comments on appellant's failure to testify. Rather, counsel argued that the statements were "implying bad character after objecting to the evidence of good character that we were trying to - - present." (Tr. at 540). Appellant's counsel explained that he could have called witnesses "and they would have all said, '[I]t's impossible for him to have done it. He's not that kind of guy.'" (Tr. at 540). He does not assert that the prosecution's statements are comments or inferences on appellant's failure to testify.

{¶52} Moreover, the trial court issued a jury instruction stating: "It is not necessary that the Defendant take the witness stand in his own defense. He has a Constitutional right not to testify. The fact that the Defendant did not testify must not be considered by you for any purpose." (Tr. at 555). Accordingly, the trial court's instruction would have cured any misconception or inference by the jury when it instructed the jury that they could not consider appellant's failure to testify for any reason.

{¶53} For these reasons, appellant's second assignment of error is without merit and is overruled.

{¶54} In appellant's third assignment of error, he asserts:

**The cumulative effect of Error 1 and Error 2 is not "harmless beyond a reasonable doubt."**

{¶55} Appellant contends that even if we find that prejudice from either Assignment of Error One or Assignment of Error Number Two is not harmless beyond a reasonable doubt, the cumulative prejudice of both errors is not harmless beyond a reasonable doubt. He submits that no physical evidence of the crimes exists and the only evidence is based upon "recovered lost memories" by accusers who were young children over a decade ago and are now adults who recently remembered these events. Appellant cites *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987) in support of reversing a conviction when the cumulative effect of errors is not harmless beyond a reasonable doubt, even if no single trial error rises to the level of prejudicial error.

{¶56} Under the doctrine of cumulative error, "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995).

{¶57} It appears that a cumulative error analysis is not necessary in this case, as we find that appellant's Assignments of Error Numbers One and Two are without merit.

{¶58} Accordingly, appellant's third assignment of error is without merit and is overruled.

{¶59} In Assignment of Error 4, appellant asserts:

**The verdict is contrary to the manifest weight of the evidence**.

{¶60}   In Assignment of Error 5a, appellant asserts:

**The convictions on Counts 3 and 11 (pandering obscenity) are not supported by legally sufficient evidence or, in the alternative, are contrary to the manifest weight of the evidence. (Tr. passim; Verdict Forms 7 & 32).**

{¶61}   In Assignment of Error 5b, appellant asserts:

**The trial judge erred by overruling Mr. Voltz's Crim. R. 29 motion for acquittal on Counts 3 and 11. (Tr. 465:3-468:4, esp. 468:2-4).**

{¶62}   Appellant asserts that sufficient evidence does not support his convictions for pandering obscenity because the prosecution presented no evidence showing beyond a reasonable doubt that: he created video recordings of sexual acts of the victims; if a video recording existed, it captured the children; or if a video recording existed, it was obscene. He submits that the trial court erred by not granting his Crim. Rule 29 motion for a directed verdict as to these counts. His counsel did move for acquittal on the pandering obscenity charges after the State presented its case-in-chief. (Tr. at 465-468). The court denied the motion.

{¶63}   Appellant correctly recites Counts 3 and 11 of the indictment as alleging that he "did…create, reproduce, or publish obscene material that has a minor as one of its participants or portrayed observers, in violation of Section 2907.321(A)(5) of the Ohio Revised Code." He points out that the indictment language is actually R.C. 2907.321(A)(1), even though the indictment states that the applicable statute is R.C. 2907.321(A)(5). He notes in his brief that the jury instructions matched the indictment language and both parties approved the jury instructions. (Appellant's Br. at 26, fn. 4).

{¶64}   In any event, appellant asserts that the only evidence of a video recording came from the testimony of EA and CS, who testified that they saw him recording them with a handheld video camera. Appellant asserts that this testimony failed to establish

beyond a reasonable doubt that the camera was on and functional, the camera had a tape, CD or hard drive recording medium, the lens cap was off, he pressed the "record" button, the camera recorded, and he was not play-acting at recording for the purpose of encouraging the actors' conduct. Appellant also challenges the testimony of EA and CS as weak because they were seven years old at the time of the incident and they had forgotten the entire incident until they were adults.

**{¶65}** Appellant also contends that even if a video recording was made, no evidence demonstrated that it captured either or both of the children or that the content of any recording was "obscene." He notes that determining whether material is obscene is a question of fact and the definition of obscenity under R.C. 2907.01(F) is unconstitutional as written. However, he acknowledges that the Ohio Supreme Court in *State v. Burgun,* 56 Ohio St.2d 354, 384 N.E.2d 255 (1978) held that the definition of obscenity in R.C. 2907.01(F) "is neither unconstitutionally overbroad or void for vagueness" when it is authoritatively construed to incorporate the guidelines prescribed in *Miller v. California,* 413 U.S. 15, .93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). He submits that when the record fails to include a copy of the alleged recording or material, it cannot be presumed to be obscene. He cites *In re M.W.*, 5th Dist. Licking No. 2018 CA 0021, 2018-Ohio-5227 in support as holding that testimony describing sexual activity in the contents of a video recording was legally insufficient to establish that the recording was obscene.

**{¶66}** Finally, appellant asserts that even if EA or CS had testified that they saw a video recording that he made, and even if the prosecutor asked them to describe the contents of the recording, Evid. R. 1002 would have excluded that testimony because there exists no original or duplicate of the video recording to prove its contents.

**{¶67}** "We address the sufficiency argument before the manifest weight argument because if a conviction is not supported by sufficient evidence, the defendant cannot be retried due to the attachment of jeopardy." *State v. Sykes*, 7th Dist. Mahoning No. 20 MA 97, 2018-Ohio-983, ¶ 11 citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997).

**{¶68}** Sufficiency of the evidence is the legal standard applied to determine whether the case may go to the jury or whether the evidence is legally sufficient as a

matter of law to support the verdict. *State v. K.A.T.*, 7th Dist. Mahoning No. 20 MA 97, 2021-Ohio-4293, ¶ 13 citing *State v. Smith,* 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997); *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). Sufficiency is a test of adequacy. *Thompkins,* 78 Ohio St.3d at 386. Whether the evidence is legally sufficient to sustain a verdict is a question of law. *Id.* In reviewing the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements proven beyond a reasonable doubt. *Smith*, 80 Ohio St.3d at 113, citing *State v. Goff*, 82 Ohio St.3d 123, 138, 694 N.E.2d 916 (1998). When evaluating the sufficiency of the evidence to prove the elements, it must be remembered that circumstantial evidence has the same probative value as direct evidence. *State v. Thorn*, 7th Dist. Belmont No. 16 BE 0054, 2018-Ohio-1028, ¶ 34, citing *State v. Jenks*, 61 Ohio St.3d 259, 272-273, 574 N.E.2d 492 (1991)(superseded by state constitutional amendment on other grounds).

{¶69} In addition, the same standard of review for reviewing a sufficiency of the evidence challenge applies to challenge a trial court's denial of a Crim. R. 29 motion for acquittal. *State v. Thomas,* 7th Dist. Mahoning Nos., 18 MA 0132 and 19 MA 0034, 2020-Ohio-3637, ¶ 10, citing *State v. Williams*, 74 Ohio St.3d 569, 576, 660 N.E.2d 724 (1996). Crim. R. 29 provided, "[t]he court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses."

{¶70} While a sufficiency of the evidence challenge tests the burden of production, a manifest weight challenge tests the burden of persuasion. *Thompkins,* 80 Ohio St.3d 89, 390 (Cook, J., concurring). Consequently, the court does not evaluate witness credibility when reviewing a sufficiency challenge. *State v. Yarbrough*, 95 Ohio St.3d 227, 233, 2002-Ohio-2126, 747 N.E.2d 216, ¶ 79. Instead, the court looks at whether the evidence is sufficient if believed. *Id.* at ¶ 82.

{¶71} R.C. 2907.321(A)(1) states:

> (A) No person, with knowledge of the character of the material or performance involved, shall do any of the following:

(1) Create, reproduce, or publish any obscene material that has a minor or impaired person as one of its participants or portrayed observers.

**{¶72}** The trial court instructed the jury that appellant was charged with pandering obscenity and they could find appellant guilty of these crimes only if they found beyond a reasonable doubt that "on or about 1999 through 2010, and in Jefferson County, Ohio, the Defendant Paul Stanley Voltz, with knowledge of the character of the material or performance involved, did create, reproduce, or publish obscene material that has a minor as one of its participants or portrayed observers." (Tr. at 560). The court went on to define the words "knowingly" and "obscene." (Tr. at 560-561).

**{¶73}** R.C. 2907.01(J) defines "material" as "any book, magazine, newspaper, pamphlet, poster, print, picture, figure, image, description, motion picture film, phonographic record, or tape, or other tangible thing capable of arousing interest through sight, sound, or touch and includes an image or text appearing on a computer monitor, television screen, liquid crystal display, or similar display device or an image or text recorded on a computer hard disk, computer floppy disk, compact disk, magnetic tape, or similar data storage device."

**{¶74}** R.C. 2907.01(F) defines "obscene" by stating that:

When considered as a whole, and judged with reference to ordinary adults or, if it is designed for sexual deviates or other specially susceptible group, judged with reference to that group, any material or performance is "obscene" if any of the following apply:

(1) Its dominant appeal is to prurient interest;

(2) Its dominant tendency is to arouse lust by displaying or depicting sexual activity, masturbation, sexual excitement, or nudity in a way that tends to represent human beings as mere objects of sexual appetite;

(3) Its dominant tendency is to arouse lust by displaying or depicting bestiality or extreme or bizarre violence, cruelty, or brutality;

(4) Its dominant tendency is to appeal to scatological interest by displaying or depicting human bodily functions of elimination in a way that inspires disgust or revulsion in persons with ordinary sensibilities, without serving any genuine scientific, educational, sociological, moral, or artistic purpose;

(5) It contains a series of displays or descriptions of sexual activity, masturbation, sexual excitement, nudity, bestiality, extreme or bizarre violence, cruelty, or brutality, or human bodily functions of elimination, the cumulative effect of which is a dominant tendency to appeal to prurient or scatological interest, when the appeal to such an interest is primarily for its own sake or for commercial exploitation, rather than primarily for a genuine scientific, educational, sociological, moral, or artistic purpose.

{¶75} Appellant is correct that no videos, images, or photos were produced at trial in his case. However, he cites no statute or case requiring the State to produce such evidence at trial or to prove any of the elements that he cited in order to sustain a pandering obscenity conviction.

{¶76} In *State v. Paquette*, 2d Dist. Clark No. 08-CA-29, 2009-Ohio-1961, a father engaged in a six-year incestuous relationship with his daughter, which began when she was 12 years old. She disclosed the abuse when she was 18 years old after she had moved out of the house. As part of the investigation, the police recorded her phone call to her father in which he disclosed that he took obscene pictures of her and took pictures of the two of them engaged in sexual intercourse.

{¶77} Among other charges, Paquette was convicted of pandering obscenity under R.C. 2907.321(A)(1). *Id.* at ¶ 1. He asserted on appeal that insufficient evidence

supported this conviction because the State failed to produce the photos. He asserted that the law required production of the photos before the jury could convict him.

**{¶78}** The appellate court disagreed, holding that, "[i]ndeed, circumstantial evidence alone may satisfy an element of an offense, because '[c]ircumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subjected to the same standard of proof.' " *Id.* at ¶ 92, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991)(paragraph one of the syllabus). The court also relied on Evid. R. 1004, which provides that "[t]he original is not required, and other evidence of the contents of a writing, recording, or photograph is admissible if: (1) Originals lost or destroyed. All originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith; or (2) Original not obtainable. No original can be obtained by any available judicial process or procedure* * *. "

**{¶79}** The Second District noted that no Ohio court had previously addressed this issue, so it looked to other jurisdictions with similar pandering obscenity statutes. *Id.* at ¶ 93. The court cited *State v. Lubotsky*, 148 Wis.2d 435, 434 N.W.2d 859 (1988), where the Wisconsin appellate court held that pandering obscenity did not require the production of photographs in order to establish the crime. The Wisconsin court held that if it accepted that argument, "we would be grafting an additional element onto the statute. Subsection (2) is directed against the *creation* of such materials, not the *possession.*" *Id.* at 440, 434 N.W.2d 859 (Emphasis added.). The *Lubotsky* Court explained that "[c]ertainly, the person who takes numerous lewd photographs and is able to dispose of them, perhaps for profit, is no less culpable than someone with one lewd photograph hidden in a wallet." *Id.*

**{¶80}** The *Paquette* Court also relied upon *Green v. United States*, 948 A.2d 554, 564, n.12, where a District of Columbia appellate court stated that, "[r]equiring the government to produce the photographs that were taken would place the only evidence sufficient for a conviction in the exclusive possession of the suspect, who could become aware of an investigation into his activities before his arrest and destroy the evidence." *Paquette*, 2009-Ohio-1961, ¶ 93, quoting *Green*, 948 A.2d at 564 n. 12.

**{¶81}** Upon analyzing the caselaw from other jurisdictions, the *Paquette* Court held that R.C. 2907.321(A)(1) criminalized the *creation* of obscene materials, and not the

*possession* of such materials. The Court therefore held that circumstantial evidence was sufficient to prove the charge and the prosecution was not required to produce the photographs in order to sustain the conviction. *Paquette*, 2009-Ohio-1961, at ¶ 94.

**{¶82}** Similarly here, the State produced the testimony of EA and CS, who both testified that they saw appellant recording them with a handheld video camera while he instructed them to perform sexual acts with one another. EA testified that "Paul would have [CS] and I perform sexual acts together and he would instruct us on what to do. Sexual acts being everything, so penetration, handjobs, blowjobs, fingering, all of it, and he recorded us while he told us what to do to each other." (Tr. at 288). She stated that she saw appellant masturbating and recording them with a handheld video recorder. (Tr. at 288-289). EA also testified that appellant told them that they were popular movie stars. (Tr. at 289).

**{¶83}** CS testified that appellant instructed EA to perform oral sex on him and he saw appellant recording the sexual acts. (Tr. at 349). CS testified that appellant also instructed EA and CS to have sexual intercourse while he recorded them. (Tr. at 349-350). He stated that appellant told them while recording that people enjoyed it and he called them movie stars. (Tr. at 350).

**{¶84}** Based on *Paquette*, this testimony constitutes sufficient evidence for purposes of R.C. 2907.321(A)(1) and actual videos, images or photographs were not required in order to convict appellant under the statute. The testimony of EA and CS also constitutes legally sufficient circumstantial evidence to establish that the video recording captured both of them engaging in sexual conduct and that such conduct was obscene, since appellant instructed them to engage in sexual acts at the ages of seven years old and he recorded those acts with a video camera.

**{¶85}** Appellant relies on *In re M.W.*, 5th Dist. Licking No. 2018 CA 0021, 2018-Ohio-5227 to assert that witness testimony is insufficient to prove that the contents of a video recording were obscene or harmful. There, the juvenile appellant recorded his minor girlfriend performing oral sex on him and showed part of the video to other juveniles at school. A complaint was filed alleging that the appellant was delinquent for pandering obscenity involving a minor and disseminating matter harmful to juveniles, among other allegations. Police were unable to unlock the appellant's cell phone to obtain the video

because the appellant would not provide the passcode. Thus, the prosecution had no video or images to produce as evidence.

**{¶86}** At the adjudication hearing, one juvenile testified that he briefly looked at the video and could not identify the participants, but it looked like it showed the appellant's penis and a girl that looked like the appellant's former girlfriend. He testified that he saw no female nudity in the video, and no movement. A second witness testified that he saw an erect penis in the video that was distant from the female's face and he saw no movement in the video. The appellant was found delinquent on all charges and appealed the delinquency finding on pandering and harmful dissemination.

**{¶87}** The *M.W.* Court noted that because the appellant's counsel had not raised this issue at the adjudication hearing, it would conduct only a plain error review. The court held that the best evidence rule under Evid. R. 1002 should have barred the testimony regarding the video because the State failed to show that it could not have obtained the video by a judicial procedure or by attempts to obtain the passcode from the appellant in order for the exception to apply. 2018-Ohio-5227, at ¶ 65. However, the court ruled that because Ohio lacked legal guidance on this evidentiary issue, the allowance of the witnesses to testify did not result in an obvious defect that affected the outcome of the adjudication.

**{¶88}** Here, there are no video recordings or images. Police searched appellant's home and his devices, but recovered no evidence because so many years had passed since appellant left the home where the abuse occurred. (Tr. at 451-452). The Evid. R. 1004(2) exception would apply and no original recording was needed. The testimony of EA and CS was sufficient as they each testified that they saw appellant recording them with his handheld video camera as he directed them to perform sexual acts and to engage in sexual intercourse when they were seven years old. For these reasons, this Court finds no merit to appellant's assertion that insufficient evidence was presented as to his pandering obscenity convictions and this assertion is overruled.

**{¶89}** Appellant also asserts that his pandering obscenity convictions are against the manifest weight of the evidence. Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." *Thompkins*, 78 Ohio St.3d at 387. Although the effect of the

evidence in inducing belief is evaluated, weight of the evidence is not a question of mathematics. *Id.* A weight of the evidence review considers whether the state met its burden of persuasion. *Id.* at 390 (Cook, J., concurring) (as opposed to the burden of production involved in a sufficiency review). When a defendant claims that a conviction is contrary to the manifest weight of the evidence, the appellate court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, citing *Thompkins*, 78 Ohio St.3d at 387.

{¶90}   "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 118, quoting *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The trier of fact occupies the best position from which to weigh the evidence and judge the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984).

{¶91}   Where a case was tried by a jury, only a unanimous appellate court can reverse on manifest weight of the evidence grounds. Ohio Constitution, Article IV, Section 3(B)(3). The power of the court of appeals to sit as the "thirteenth juror" is limited in order to preserve the jury's primary function of weighing the evidence. *Thompkins*, 78 Ohio St.3d at 389.

{¶92}   We find that the jury did not clearly lose its way by convicting appellant of pandering obscenity. The jury could find the testimony of EA and CS credible that they saw appellant with a handheld video camera recording them engaging in sexual acts with one another. The jury could weigh this testimony and find it credible.

{¶93}   Appellant also contends that evidence was lacking to convict him on two counts of pandering obscenity because Counts 3 and 11 contain identical language, there was no physical evidence, and EA and CS testified to the same single incident of him video recording them engaging in sexual intercourse. Appellant cites *State v. Stone*, 1st Dist. No. C-040323, 2005-Ohio-5206, ¶ 10 for support that "[t]he 'prosecution-unit for child

pornography is 'each individual image.' " He contends that even if sufficient evidence existed of a video, the one video cannot support two convictions.

**{¶94}** EA and CS appear to testify to the same instance of seeing appellant video recording them engaged in sexual conduct and intercourse with each other. (Tr. at 288-289, 348-350, 377-379). Further, the prosecution appeared to concede during closing argument that Counts 3 and 11 stem from the same filming. (Tr. at 517).

**{¶95}** Defense counsel raised this issue in a Crim. R. 29 motion for acquittal after the close of the state's case-in-chief. Counsel asserted that sufficient evidence was lacking for Counts 3 and 11 because no video was found containing any obscene material, and no evidence showed that there was film in the camera or that any video was ever made. (Tr. at 465-466). The State responded that the testimony of EA and CS established evidence of appellant creating a video recording. (Tr. at 466-467). The trial court agreed with the State and overruled appellant's Crim. R. 29 motion.

**{¶96}** Insofar as this assertion concerns the sufficiency of or the manifest weight of the evidence to sustain the convictions, the above analyses apply. Therefore, we find that the trial court did not abuse its discretion by overruling appellant's Crim. R. 29 motion.

**{¶97}** To the extent that appellant raises a merger issue, this was not raised or argued before or at trial. Accordingly, only a plain error review under Crim. R. 52(B) would apply. *State v. Sanders*, 2d Dist. Clark No. 2019-CA-86, 2021-Ohio-2431, at ¶ 34 ("Sanders cannot prevail on his merger claim unless he shows that '(1) there was an error, (2) the error was 'plain,' i.e., obvious, and (3) the error affected substantial rights.' " *State v. Tench*, 156 Ohio St.3d 955, 2018-Ohio-5205, 123 N.E.3d 955, ¶ 217, citing *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002)).

**{¶98}** The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." The Fourteenth Amendment applies double jeopardy protections to Ohio citizens and the Ohio Constitution provides this protection as well. *Benton v. Maryland*, 395 U.S. 784, 794, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969); Ohio Constitution, Article I, Section 10. One of the protections under the Double Jeopardy Clause is against "multiple punishments for the same offense." *North Carolina v. Pearce*,

395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), *overruled on other grounds*, *Alabama v. Smith,* 490 U.S. 794, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989).

**{¶99}** R.C. 2941.25 provides:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

**{¶100}** "R.C. 2941.25(A) allows only a single conviction for conduct that constitutes 'allied offenses of similar import.' But under R.C. 2941.25(B), a defendant charged with multiple offenses may be convicted of all the offenses if any one of the following is true: (1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the offenses were committed separately, or (3) the conduct shows that the offenses were committed with separate animus." *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, citing *State v. Moss*, 69 Ohio St.2d 515, 519, 433 N.E.2d 181 (1982).

**{¶101}** Appellant relies on *State v. Stone*, 1st. Dist. Hamilton No. C-040323, 2005-Ohio-5206, to assert that the one recording that both EA and CS testified to constitutes one offense, even if it depicts two victims. In *Stone*, the appellate court held that multiple counts of pandering obscenity were not allied offenses of similar import because each time Stone downloaded an image on his computer and saved it, he recommitted himself to a new act of child pornography. 2005-Ohio-5206, at ¶ 9. That court cited to other jurisdictions where courts had considered a "proper prosecution-unit," as each individual image.

**{¶102}** However, in *State v. Ruff*, at ¶ 26, the Ohio Supreme Court explained:

The evidence at trial or during a plea or sentencing hearing will reveal whether the offenses have similar import. When a defendant's conduct victimizes more than one person, the harm for each person is separate and distinct, and therefore, the defendant can be convicted of multiple counts. Also, a defendant's conduct that constitutes two or more offenses against a single victim can support multiple convictions if the harm that results from each offense is separate and identifiable from the harm of the other offense. We therefore hold that two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable.

{¶103} The Court explained that in other cases, it had held that when a defendant's conduct puts more than one person at risk, "that conduct could support multiple convictions because the offenses were of dissimilar import." *Id.* at ¶ 23, citing *State v. Jones*, 18 Ohio St.3d 116, 118, 480 N.E.2d 408 (1985) (two offenses of dissimilar import found because even though there was only one car accident, the defendant's conduct killed two people); and *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, ¶ 48 (defendant set one fire, but six offenses of dissimilar import were found because of the risk of injury to each person).

{¶104} In *State v. Hipps*, 7th Dist. Mahoning No. 16 MA 0098, 2017-Ohio-7707, we agreed with the court's explanation in *State v. Starcher*, 5th Dist. Stark No. 2015CA00058, 2015-Ohio-5250, that:

*** the children depicted in the images or videos are the victims of the pandering offenses. [*State v. Duhamel*, 8th Dist. Cuyahoga No. 102346, ¶ 61, citing *State v. Meadows,* 28 Ohio St.3d 43, 49, 503 N.E.2d 697 (1986). Further, [e]ach video and image presents a different child or group of children. Individuals who view or circulate child pornography harm the child in several

ways (1) by perpetuating the abuse initiated by the creator of the material, (2) by invading the child's privacy, and (3) by providing an economic motive for producers of child pornography. *U.S. v. Norris*, 159 F.3d 926 (5th Cir. 1998). As previously stated, the dissemination of child pornography exacerbates and continues the exploitation and victimization of the individual child. *[New York v. Ferber*, 458 U.S. 747 at 759, 102 S.Ct. 3348, 73 L.Ed.2d 1113 [ (1982) ]; s*ee also U.S. v. Sherman,* 268 F.3d 539, 545 (7th Cir. 2001) (even a "passive consumer who merely receives or possesses the images directly contributes to this continuing victimization.").

**{¶105}** While *Hipps* also involved multiple videos with multiple child victims, appellant's conduct in this case of creating one video recording inflicted harm on each of the children he filmed. EA and CS suffered individual harm, victimization, and privacy invasion from one video recording. Consequently, we find that two pandering obscenity offenses and convictions were warranted.

**{¶106}** Accordingly, appellant's Assignments of Error Numbers 4, 5a, and 5b are without merit and are overruled.

**{¶107}** In Assignment of Error 6, appellant asserts:

> **The jury convicted on three counts of anal rape of CS, even though there is "legally sufficient" evidence of only two such rapes. (Tr. passim; Verdict Forms 20-23, 24-27, 28-31).**

**{¶108}** Appellant contends that CS's testimony was insufficient to establish three instances of rape by anal intercourse beyond a reasonable doubt. He argues that one of the convictions in Counts 8, 9, or 10 for the anal rape of CS must be reversed.

**{¶109}** Again, in reviewing the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements proven beyond a reasonable doubt. *Smith*, 80 Ohio St.3d at 113, citing *Goff*, 82 Ohio St.3d 123, 138, 694 N.E.2d 916 (1998). When evaluating the sufficiency of the evidence to prove the elements, it must be

remembered that circumstantial evidence has the same probative value as direct evidence. *Thorn*, 7th Dist. Belmont No. 16 BE 0054, 2018-Ohio-1028, ¶ 34, citing *Jenks*, 61 Ohio St.3d 259, 272-273, 574 N.E.2d 492 (1991)(superseded by state constitutional amendment on other grounds).

{¶110}    Appellant was charged with three counts of rape of CS by anal intercourse pursuant to R.C. 2907.02(A)(1)(b). That section provides in relevant part that:

> (A)(1) No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies:
>
> * * *
>
> (b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person.

{¶111}    Sexual conduct is defined under R.C. 2907.01(A) as:

> vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

{¶112}    Sufficient evidence existed to establish that three instances of anal intercourse occurred between appellant and CS. CS testified as follows at trial:

> Q  Were there other sexual acts that this Defendant committed against you?
>
> A [CS]: There were.

Q: Can you describe those for the Jury, please.

A: He anally raped me.

Q: Are you able to estimate how many times that happened to you?

A: I would say two or three.

Q: Okay. Tell me what you remember about those acts.

A: I remember that he told me that he was going to continue to do it until he could finish without my penis getting erect.

Q: Did you experience pain during those acts of anal intercourse with the Defendant?

A: I did.

Q: I don't know how else to say this explicitly. Were you the same age range that you're talking about with the other acts?

A: I believe so.

Q: Was he able to fully penetrate you anally?

A: No, and he made a comment about that as well.

Q: Okay. What was the comment about that?

A: He said that he couldn't put it all the way in or else people would know.

Q: And you're saying that happened anywhere between two to three times?

A: Yes.

(Tr. at 351-353). CS also described instances where appellant would require him and BA to wrestle and the loser would have to perform sexual acts with appellant. (Tr. at 353). CS stated that he always won, "except for one time when he said that it was not fair, and then he anally raped me." (Tr. at 353). The prosecution then asked:

Q: And you remember that incident specifically?

A [CS]: Yes.

Q: Okay. Then separately, the incidents of him saying that he could not penetrate you fully or else somebody would know?

A: Correct.

(Tr. at 353-354).

{¶113} Viewing CS's testimony in a light most favorable to the prosecution, the jury could have found that sufficient evidence of three instances of rape by anal intercourse. CS testified that he remembered "two or three" instances of anal intercourse where appellant told him that he could not penetrate him fully because someone may find out, and he testified to another instance after a wrestling match. The prosecution specifically clarified whether the anal intercourse that occurred after the wrestling match was separate from the other incidents of anal intercourse about which CS testified. (Tr. at 353-354).

{¶114} Accordingly, appellant's sixth assignment of error is without merit and is overruled.

{¶115} In appellant's seventh assignment of error, he asserts:

**The trial judge erred by applying the Adam Walsh Act.**

{¶116} Appellant contends that the trial court erred by classifying him as a Tier III sexual offender under the Adam Walsh Act. Appellant asserts that the trial court should have applied Megan's Law, H.B. 180, 146 Ohio Laws, Part II, 2560, because no evidence existed that any of the offenses for which he was convicted occurred on or after January 1, 2008, the effective date of the Adam Walsh Act. Appellant contends that the Adam Walsh Act violates Ohio's constitutional prohibition against retroactive laws to the extent

that it purports to apply to offenses committed after January 1, 2008. He cites *State v. Williams*, 129 Ohio St.3d 344, 2011-Ohio-3374, and *In re Bruce S.*, 134 Ohio St.3d 477, 2012-Ohio-5696 in support.

**{¶117}** Appellee cites to the transcript where appellant's counsel agreed that the Adam Walsh Act classification applied. (Tr. at 633-634). Appellee asserts that since appellant's counsel did not object to the trial court's designation and in fact conceded to it, we should overrule this assignment of error. (Tr. at 633-634).

**{¶118}** Before sentencing, the trial court asked counsel for statements. Appellant's counsel stated:

> Back in or around the early 2000's, there were separate statutes dealing, also, with the term "sexual predator" and the criteria for certain classifications. All of those have been repealed and no longer apply, even though the sentencing in the rape statute from that time period does apply.
>
> We currently have a statutory scheme where people convicted of a sexually-oriented offense are classified as either Tier I, Tier II, or Tier III sex offenders. The Ohio Supreme Court has said that that is retroactive and applies to all past crimes, so it doesn't really matter what the law as to that was in 2000. In this case, the Court would have no choice but to classify Mr. Voltz as a Tier III offender, requiring registration and other requirements that go along with that.

(Tr. at 633-634).

**{¶119}** In 2006, Congress enacted the Adam Walsh Act, which created tougher national standards for sex offender registration. *State v. Bodyke*, 126 Ohio St.3d 266, 2010-Ohio-2424, 933 N.E.2d 753, at ¶ 18-19. Congress encouraged the states to adopt these tougher standards. *Id.* In 2007, the General Assembly enacted Senate Bill 10, which is Ohio's version of the Adam Walsh Act; this new law replaced Megan's Law. *Id.* at ¶ 20; 2007 Am. Sub. S.B. No. 10. Ohio's version of the federal Megan's Law, Section 14071, Title 42, U.S.Code, was enacted in 1996, Am.Sub.H.B. No. 180, 146 Ohio Laws, Part II,

2560, and significantly amended in 2003 by Am.Sub.S.B. No. 5 ("S.B. 5"), 150 Ohio Laws, Part IV, 6558.

**{¶120}** In 2011, the Ohio Supreme Court found that the Adam Walsh Act is punitive in nature and it was unconstitutional to apply that act retroactively to offenders who committed sex offenses prior to the January 1, 2008 effective date of the Adam Walsh Act. *State v. Williams*, 129 Ohio St.3d 344, 2011-Ohio-3374, syllabus.

**{¶121}** Appellee is correct that defense counsel not only raised no objection to the Adam Walsh Act application, but he actually stated that it should apply. "It is well-established that the '[f]ailure to raise at the trial court level the issue of the constitutionality of a statute or its application, which issue is apparent at the time of trial, constitutes a waiver of such issue and a deviation from this state's orderly procedure, and therefore need not be heard for the first time on appeal.' " *State v. Althouse*, 4th Dist. Ross No.16CA3578, 2018-Ohio-780, at ¶ 11, quoting *State v. Awan*, 22 Ohio St.3d 120, 489 N.E.2d 277 (1986), syllabus.

**{¶122}** However, in *State v. Simmons*, 7th Dist. Mahoning No. 12 MA 138, 2014-Ohio-582, we reversed the trial court's classification of the defendant as a Tier III sex offender even though he had agreed to it in his plea agreement. We based our decision on *Williams,* the Ohio Supreme Court's treatment of cases following *Williams,* and the interests of justice. *Id.* at ¶ 31. We held that these were "compelling reasons to exercise our discretion to allow an appellant's constitutional challenge despite their failure to raise it below." *Id.* We noted that the Ohio Supreme Court had granted review and remanded cases after *Williams,* even where the defendant had failed to challenge the designation or lost their constitutional challenge in the courts below.

**{¶123}** Based on *Williams* and *Simmons*, we find that the trial court erroneously applied the Adam Walsh Act classification to at least some of appellant's convictions. Appellant was convicted of the following crimes for which he was designated a Tier III Sex Offender: Count 1 (rape of EA); Count 2 (rape of EA); Count 5 (rape of BA); Count 7 (rape of CS); Count 8 (rape of CS); Count 9 (rape of CS); and Count 10 (rape of CS). The jury verdict forms convicting appellant of these offenses were filed on June 9, 2021 and the court's sentencing entry imposed the Tier III Sex Offender designations on July 22, 2021.

**{¶124}** However, the jury verdict forms state that the jury found appellant guilty of committing the offenses identified in Count 1 (rape of EA) and Count 2 (rape of EA), "on or about 1999 through 2010." (Tr. at 592-593, 595, 597, 605). The commission of these crimes therefore predates and postdates the January 1, 2008 effective date of the Adam Walsh Act. It is noted that while the jury verdict identified 2010 as the relevant end date of the offenses against EA as per the indictment, a dissolution of the marriage between appellant and KC was filed with the court in October 2007 and the marriage was officially terminated in March 2008. (Tr. at 225-226).

**{¶125}** The jury verdict form further indicates that the jury found appellant guilty of committing the crime in Count 5 (rape of BA) "on or about 1998 through 2007." (Tr. at 596). This predates the January 1, 2008 effective date of the Adam Walsh Act and should have been governed by Megan's Law.

**{¶126}** In Count 7 (rape of CS), Count 8 (rape of CS), Count 9 (rape of CS), and Count 10 (rape of CS), the jury verdict form indicates that the jury found that appellant committed these crimes "on or about 1998 through 2003." (Tr. at 598, 600-603). These crimes also predate the January 1, 2008 effective date of the Adam Walsh Act, and the trial court appears to have erred by not applying Megan's Law.

**{¶127}** Accordingly, appellant's seventh assignment of error has merit as to the trial court improperly applying the Adam Walsh Act to appellant's convictions in Count 5, Count 7, Count 8, Count 9, and Count 10.

**{¶128}** In sum, we find no merit to appellant's Assignments of Error Numbers 1, 2, 3, 4, 5a, 5b, and 6, and these assignments are overruled. We find merit in part to appellant's Assignment of Error Number 7 and remand this case to the trial court for resentencing as to sex offender registration under Megan's Law for appellant's convictions under Counts 5, 7, 8, 9, and 10.


Waite, J., concurs.
D'Apolito, J., concurs.


Case No. 21 JE 0020

---

For the reasons stated in the Opinion rendered herein, appellant's Assignments of Error Numbers 1, 2, 3, 4, 5a, 5b, and 6 are overruled. Appellant's seventh assignment of error is sustained in part and overruled in part. It is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Jefferson County, Ohio, is reversed and vacated only as to the application of The Adam Walsh Act and sex offender registration in Counts 5, 7, 8, 9, and 10. The trial court's judgment is affirmed in all other respects. We hereby remand this matter to the trial court for further proceedings according to law and consistent with this Court's Opinion. Costs to be taxed against the Appellant.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**